## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

PEGGY MARIE SCHMITT,                    CASE NO.  03-3295   ADM/AJB

     Plaintiff,

     v.

CHASE MANHATTAN BANK NA, et al.,

     Defendants.

---

## TRANS UNION, LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

---

## I.    INTRODUCTION

Trans Union, LLC ("**TU**") moves for summary judgment as to each claim brought against TU by Plaintiff, Peggy Marie Schmitt, in accordance with Fed.R.Civ.P. 56.  TU's Motion for Summary Judgment should be granted since:

A.    The proximate cause of any alleged injury suffered by Plaintiff was First USA's failure to correct its erroneous reporting of "deceased" on Plaintiff's credit card account, even after it became aware that its reporting was inaccurate;

B.    Prior to Plaintiff's first communication disputing the "deceased" status, as reported by First USA, TU had no notice of the erroneous "deceased" remarks, nor did TU have any reason to doubt the accuracy of the information reported by First USA regarding Plaintiff because TU knows First USA to be a reliable source of information;

C. TU has produced undisputed evidence that its procedures to assure maximum possible accuracy were compliant with the FCRA despite the fact that those procedures did not discover the obscure human errors of its furnishers that caused the inaccuracies at issue in this case;

D. TU fulfilled its obligations under the FCRA in the processing of Plaintiff's disputes. It was the failure of Trans Union's furnishers, not TU, that allowed the inaccurate information to remain even after Plaintiff disputed it;

E. Plaintiff can produce no evidence that TU acted with conscious disregard of Plaintiff's rights to support a willful claim; and

F. Plaintiff's claim for credit defamation is preempted by the FCRA.

## II. <u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

## A. PROCEDURES FOR COLLECTING CREDIT INFORMATION AND ISSUING CREDIT REPORTS

TU is a consumer reporting agency as that term is defined by the Fair Credit Reporting Act (the "**FCRA**"), 15 U.S.C. 1681a(f). (Stockdale Aff., ¶ 2). TU, like the other major CRAs, regularly receives information from various sources around the country including banks, credit unions, automobile dealers, student loan providers and others (these sources are known as "**furnishers**" within the credit reporting industry and under the FCRA). <u>Id</u>. at ¶ 3. TU collects information from more than 85,000 furnishers. <u>Id</u>.

Before TU permits a furnisher to report information into its database, the furnisher's information is put through a rigorous set of inspections, audits and

threshold tests to ensure the furnisher will report information accurately.  <u>See id.</u> at ¶¶ 25-59 (where these processes are discussed in greater detail).  After, a furnisher starts reporting information, TU continues monitoring that furnisher's data on a monthly basis to ensure that TU's high levels of accuracy are maintained.  <u>Id.</u>

TU's experience with First USA[1], Saks and Chase is that they are all reliable sources of credit information and are unlikely to report inaccurate information except in isolated instances.  <u>Id.</u> at ¶ 86.  These furnishers have never been deemed unreliable, never exceeded TU thresholds, never failed audits and have consistently passed TU's due diligence requirements.  <u>Id.</u> at ¶¶ 88, 89.  The same is true of these furnishers' data processor, FDR.  <u>Id.</u> at ¶ 90.

The process by which TU receives, sorts, and stores information is largely electronic.  <u>Id.</u> at ¶ 5.  Electronic transmission is used to ensure the greatest level of uniformity and accuracy.  <u>Id</u> at ¶ 6.  Furnishers report credit information to TU through the use of coded tapes that are transmitted on a monthly basis.  <u>Id.</u> at ¶ 7.  TU receives approximately 22 billion records per year from its furnishers.  <u>Id.</u> at ¶ 8.  TU's contracts with its furnishers require those furnishers to report accurate information. <u>Id.</u> at ¶ 9. TU processes the information electronically and, through a complex set of logic programs, TU's database matches the credit information with a particular consumer's credit file.  <u>Id.</u> at ¶ 10.  The credit file is

---

[1]     First USA was purchased by Bank One in July 1999.  However, for purposes of this case, both First USA and Bank One will be referred to as "**First USA**" since the distinction is of no consequence. Stockdale Aff., ¶ 85, .n.1.

then updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to as "**tradelines**" within the industry). Id. at ¶ 11.  TU maintains credit files on approximately 200 million consumers.

The transmission of information using coded tapes is accomplished through software known as "Metro 2".  Id. at ¶ 16.  The Metro 2 software allows furnishers to report information in various "fields".  Id. at ¶ 17.  A "field" is a space allocated for a particular type of information.  Id. at ¶ 18.  Each of those fields is given a name and each field has a certain value associated with it.  Id.  In addition to providing the basic reporting format, Metro 2 provides standard codes for reporting certain types of information.  Id. at ¶ 19.

TU assembles the information it collects into credit files and generates "consumer disclosures", as that term is defined by Section 1681g of the FCRA, and "consumer reports", as that term is defined by Section 1681a of the FCRA (more commonly known as "**credit reports**") that are then given to consumers or others (also known as "**subscribers**" within the credit reporting industry), respectively.  Id. at ¶ 20.  TU can then make reports available within seconds upon request to "subscribers" who are engaged in credit-related transactions with consumers.  Id. at ¶ 21.  The reports are usually obtained through a computer terminal at the subscriber's place of business.  Id. at ¶ 22.  TU does not originate or create any credit information, and TU does not make loans or decide who should receive credit.  Id. at ¶ 23.  Both of those functions are handled entirely by the credit grantors themselves.  Id. at ¶ 24.

4

## B.     ECOA CODE AND DECEASED REPORTING

One of the Metro 2 fields is called the "ECOA" code. Id. at ¶ 60.    This field allows furnishers to report the status of the consumer in relation to the account by reporting one of several codes. Id. at ¶ 61.   For example, in the case of an individually held credit card account, the furnisher will report the code "I" in the ECOA code. Id. at ¶ 62.   This is also the field in which a furnisher may report that a consumer associated with the account is deceased.  Id. at ¶ 63.     To report deceased, a furnisher will report an ECOA code of "X" – as both First USA and Saks did in this case.  Id. at ¶ 64.

At the present time, TU maintains more than five million tradelines which are reporting a deceased code.  Id. at ¶ 65.  Of the consumer files which contain tradelines reporting a deceased code, more than two million files contain only one tradeline reporting a deceased code.  Id. at ¶ 66.  Also, at the present time, there are more than eleven thousand TU subscribers reporting at least one tradeline with a deceased code.  Id. at ¶ 67.

TU's experience is that it is not unusual for deceased consumers to have apparently "active" accounts, either because transactions are not reconciled until after the consumer has died or because a spouse or personal representative is paying off the decedent's debts or incurring new ones on the same account or for a variety of other reasons including identity fraud.  Id. at ¶ 68.  If TU were required to notify consumers that one creditor has reported them deceased, TU

would incur enormous costs since such notifications could not be done electronically.  Id. at ¶ 69.

Another Metro 2 field is called the "Compliance Condition Code" or "CCC". Id. at ¶ 70.  This field allows furnishers to report or in some cases to delete certain credit information.  Id. at ¶ 71.  There are ten (10) different codes or values that a furnisher can report in the Compliance Condition Code.  Id. at ¶ 72. Each code results in a different remark being generated.  Id. at ¶ 73.  For example, a furnisher wanting to report that the consumer had disputed account information would report a CCC of "XB".  Id. at ¶ 74.  This would cause TU's system to generate a remark of "Account information disputed by consumer" into a field called the "Remarks Field."  (Stockdale Aff., ¶ 75; see also Kenworthy Aff., Ex. B at 65:20-24).

When TU's system receives an "X" in the ECOA code of a particular tradeline from a furnisher, it will create a corresponding remark of "Deceased" which TU's system outputs into the "Remarks Field".  (Stockdale Aff., ¶ 76).  This field is used to maintain a variety of different types of credit information in addition to "deceased" information.  Id. at ¶ 77.  For example, if a furnisher reports a "3" in the ECOA code then TU's system will output a remark of "Authorized User" into the Remarks Field.  Id. at ¶ 78.

Most importantly, for purposes of this case, a furnisher can report a code of "XR" into the Compliance Condition Code.  Id. at ¶ 82.  An "XR" code will cause TU's system to delete any remark currently appearing in the Remark Field,

including a remark of "Deceased".  Id. at ¶ 83.  Because most furnishers do not actually report information into the Remarks Field (as explained above, the information is generated based on other information furnishers do report), a furnisher wanting to delete information from the Remarks Field must report an "XR" in the Compliance Condition Code.[2]  Id. at ¶ 84.

## C.   CONSUMER DISPUTES

TU maintains procedures to conduct reinvestigations of disputes.  (Little Aff., ¶ 2).   In general, when TU receives a dispute from a consumer, TU investigates the dispute using one of two systems developed for the purpose of processing and tracking disputes; the Consumer Dispute Verification process ("**CDV**"), and the Automated Consumer Dispute Verification process ("**ACDV**"). (Little Aff., ¶ 2).   Through these systems, TU sends to the furnisher the information that TU is currently reporting about the consumer, tells the creditor what the consumer's dispute is, and asks the creditor to investigate the information it has concerning the relationship it has with the consumer and determine whether the information that it is reporting to TU is correct and complete.  Id. at ¶ 3.  The furnisher is also asked to verify that the indicative

---

[2]      First USA originally testified, through its representatives Joette Herrera and Sharon Adams, that First USA had no way of changing the information contained in TU's Remarks Field.  However, on cross-examination, Adams (whom Herrera testified would be more knowledgeable on the subject) admitted that she had no basis for her assertion and that if a TU representative testified that a Remarks Field could be deleted by reporting an "XR" in the CCC field she would have no reason to disagree with that testimony.  Therefore, there is no genuine dispute on this point.  (See Kenworthy Aff., Ex. B, at 66:12-67:4).

information TU has on the consumer matches the indicative information maintained in the furnisher's records and to verify that it is associated with the particular account being disputed.[3]  Id. at ¶ 4.

This process leads to one of three general outcomes:

1. The creditor reports back to TU that the information is indeed correct. In that case, TU considers the creditor's verification along with any information that the consumer supplied and either revises the consumer's credit report or leaves the report unchanged, as is appropriate under the circumstances.

2. The creditor reports back to TU that the information is erroneous.  In that case, TU either deletes or modifies the information on the credit report, as appropriate.

3. The creditor does not respond to TU within the required time.  In that case, where appropriate, TU deletes the disputed item from the consumer's credit report as unverifiable.

Id. at ¶ 5.

Regardless of the outcome of its reinvestigation, TU notifies the consumer of the results of the reinvestigation.  Id. at ¶ 6.  In addition, TU always gives the consumer the chance to insert into the credit report a statement regarding the information that he or she disputes.  Id. at ¶ 7.  TU may also use additional procedures in individual cases depending on the precise dispute involved and the circumstances of the case.  Id. at ¶ 8.

ACDVs are transmitted to furnishers via an electronic system known as the "E-OSCAR" system.  (Little Aff., ¶ 10).  E-OSCAR is a web-based, Metro 2

---

[3] "Indicative information" refers to general information regarding a consumer such as name, address, social security number, date of birth, etc.

compliant, automated system that enables furnishers and CRAs to create and respond to consumer credit history disputes. Id. at ¶ 11. The ACDV process tracks and manages an ACDV initiated by a CRA on behalf of a consumer and routes it to the appropriate furnisher. Id. at ¶ 13. The furnisher returns the ACDV to the initiating CRA with the updated information (if any) relating to the consumer's credit history. Id. at ¶ 14.

In responding to an ACDV, a furnisher informs TU that either the disputed information is "Verified" or that the disputed information should be "Changed" or that the disputed item of information should be "Deleted". Id. at ¶ 18. To do this the furnisher literally checks a box. Id. at ¶ 19. If a furnisher chooses to verify the information it will check a box called "Verified As Reported". Id. at ¶ 20. Once checked, this will instruct the CRA that all information about the disputed tradeline is, in fact, accurate and that no changes should be made. Id. at ¶ 21. If a furnisher chooses to change information it will check a box called "Change Data As Show" and then will input changes into the various fields of information that need to be changed. Id. at ¶ 22.

However, if a furnisher elects to check the Verified As Reported box but also inputs changes into the various data fields, they are provided with an alert. Id. at ¶ 23. The alert (which appears as a pop-up window in their system) reads:

> The response you selected is 1 [Verified As Reported] – Account information accurate as date reported. If you have entered any information on the Account Information, or Associated Consumer screens it will not be transmitted to the Credit Reporting Agency. By submitting this verification, you certify that you have verified the

accuracy of the entire item in compliance with all legal requirements and your computer and/or manual records will be adjusted to reflect changes noted.

Id. at ¶ 24.  In order for the furnisher to complete processing of the ACDV, it must override the warning.  Id. at ¶ 25.  Otherwise, it can cancel at this point and make changes or corrections to its ACDV response.  Id. at ¶ 26.

Whenever a furnisher directs TU to change information on a consumer's credit file that furnisher affirms to TU that it has made the same changes to its own systems.  Id. at ¶ 33.  This affirmation is made by the furnisher on the form used to process the dispute  (Little Aff., ¶ 34; Kenworthy Aff., Ex. H).

Finally, TU monitors how its furnishers respond to disputes and tracks furnisher dispute histories.  (Little Aff., ¶ 38).  TU has reviewed the responses to consumer disputes and dispute histories of First USA (a/k/a Bank One), Saks, and Chase and those furnishers respond reliably to disputes.  Id. at ¶ 39. Further, TU has received no notice of systemic problems with these furnishers. Id.

## D.  FIRST USA'S MISHANDLING AND MISREPORTING OF PLAINTIFF'S ACCOUNT

At all times relevant, Plaintiff held a credit card with First USA, Account No. XXXX-XXXX-XXXX-8870 (the "**Account**").  Originally, First USA reported Plaintiff's Account to TU with an ECOA Code of "I," which is the code for an "individual account".  (Kenworthy , Ex. C at 32:7-15).  At the same time there was no code or remark indicating a deceased status.  Id. at 32:7.

On September 11, 2002, First USA received a letter from The Law Office of William Schroeder regarding the estate of "Peggy L. Schmitt." (Kenworthy Aff., Ex. C at 33:8–18; Complaint, Ex. 2). Peggy L. Schmitt (as well as Plaintiff Peggy M. Schmitt) had a credit card account with First USA. (Kenworthy Aff., Ex. C at 33:8-18). On October 4, First USA imaged that letter and forwarded it to First USA's Estates Department for processing – meaning that the account of Peggy L. was to be coded to reflect the fact that Peggy L. had died. Id. at 33:24–34:4; 36:24–38:1; 38:7–15. However, the Estates Department incorrectly processed the letter by inserting deceased codes into the wrong account. Id. at 40:8-41:1. Instead of changing the codes on Peggy L.'s account records, First USA changed the codes on the Plaintiff, Peggy M.'s account records. Id. at 40:8-41:1.

First USA changed two codes on Plaintiff Peggy M.'s account records. First USA added a code of "P" to Plaintiff's "Deceased Flag Field", which changed the Account's ECOA code (the code that is reported to TU by First USA) from "I" (the code for "individual") to "X" (the code for "deceased"). Id. at 38:1-39:5. In addition, First USA changed another internal field known as the "Status Code" to "I" which is another code for "deceased." Id. at 39:18–23; 40:8–12.

On October 12, 2002, First USA received court documents stating that Peggy L. was deceased and informing First USA of a court date for probate. Id. at 50:9-18. First USA could not confirm the date of death in those documents, and needed additional information. Id. at 50:15 – 18. Nonetheless, on October

13, 2002, the Bank changed the Status Code to "I", meaning deceased, without receiving any other information. Id. at 54:7 – 55:7.

On October 20, 2002, First USA received a phone call from Plaintiff, which prompted First USA to note on its internal records the following: "someone calls in claiming to be consumer" and to mark Plaintiff's Account as "suspect fraud." Id. at 55:10–24. First USA asked Plaintiff to send something in writing in order to correct the reporting of "deceased" on the Account. Id. at 55:24–56:8. On October 23, 2002, Plaintiff called First USA three more times in an effort to have the deceased reporting removed from her Account. Id. at 56:24 – 57:2.

Then, on October 24, 2002, First USA received a second letter from attorney Schroeder (who apparently had been alerted to the mix-up) this time requesting that First USA correct its incorrect reporting of the deceased information on Plaintiff's Account. (Kenworthy Aff., Ex. C at 46:11 – 47:4; Complaint, Ex. 3). First USA's Imaging Department was then directed to take the first Schroeder letter that was originally scanned into Plaintiff Peggy M.'s account and rescan it into the Peggy L. account. (Kenworthy Aff., Ex. C at 40:13 – 41:1).

On October 25, 2002, First USA removed the "I" from Plaintiff's Account's internal Status Code. Id. at 57:5–59:1. However, First USA failed to remove or change the deceased code of "P" in the Deceased Flag Field or the ECOA code of "X". Id. at 61:13-16; 18–20. Therefore, First USA's efforts to correct their mistake had no effect upon the information which First USA transmitted to TU. Id. at 63:11–13.

First USA now believes that the error in not correcting Plaintiff's Account occurred when it tried to restore the Account. Id. at 81:19-24. Specifically, there was an error in restoring the Deceased Flag field to what it should have been. Id. In fact, as far as First USA can tell, no one ever checked to make sure that this was done. Id. at 82:7-9.

First USA reports credit information to TU in the Metro 2 format during the first week of every month, usually on the 3rd, 4th, 5th or 6th day of the month. Id. at 30:2–6; 30:7-11. First USA archives its reporting in an internal record called a "Credit Bureau Record Dump Report" (the "**Dump Reports**"). Id. First USA's Dump Reports are essentially a list of database fields which show the corresponding codes reported by First USA to TU (and the other CRAs) in each of the various fields. Id. Among those fields is the "ECOA Code."

First USA continued to report the deceased comment in its Dump Reports to TU for over a year and a half until some time in July 2004. (Kenworthy Aff., Ex. C at 82:24–84:2; see also Kenworthy Aff., Ex. J).

## E.   SAKS' MISHANDLING AND MISREPORTING OF PLAINTIFF'S ACCOUNT

At all times relevant, Plaintiff also held a credit card with Saks, Account No. XXXX-XXXX-XXXX-5962 (the "**Saks Account**"). In September of 2002, Saks also received a letter from The Law Office of William Schroeder regarding the estate of "Peggy L. Schmitt." (Kenworthy Aff., Ex. D at 10:7-18); see also Complaint, Ex. 2. At that time, Saks' data system maintained the Plaintiff's

13

account under the name "Peggy Schmitt" – with no middle initial indicated on the account.  (Kenworthy Aff., Ex. D at 34:21 – 35:7).  As a result, Saks' records indicate that in September of 2002, it processed the Schroeder letter by coding its system to reflect that Plaintiff was deceased.  (Kenworthy Aff., Ex. D at 10:7-18; 23:17 – 24:8; and  Ex. E at 12:18 – 13:1).

Later, in November of 2002, Saks received a second letter from attorney Schroeder requesting that Saks correct its incorrect reporting of the deceased information on Plaintiff's account.  (Kenworthy Aff., Ex. D at 10:19 – 11:8; see also Complaint, Ex. 3).  Saks changed its system to reflect that the Plaintiff was not deceased.  (Kenworthy Aff., Ex. E at 13:25 – 14:9).

## F.   PLAINTIFF'S DISPUTES AND TU'S REINVESTIGATIONS

### 1.   First Dispute (Accuracy Of Deceased Status)

On December 26, 2002, TU received a letter from Plaintiff dated December 20, 2002.  (Little Aff., ¶ 40 and Ex. A).  Plaintiff's letter indicated that some of Plaintiff's creditors were reporting her as deceased and that this was incorrect. (Little Aff., ¶ 41, Ex. A).

On December 30, 2002, TU inspected Plaintiff's credit file and determined that two of Plaintiff's creditors were reporting Plaintiff's accounts with a deceased status – First USA and Saks.  (Little Aff., ¶ 42).  None of Plaintiff's other accounts were reporting a deceased status.  Id. at ¶ 43.

### (a)   First USA Reinvestigation (First)

On December 30, 2002, First USA was reporting the following information about Plaintiff's First USA Account:

| | |
|---|---|
| ACCT NAME / NUMBER: | FIRST USA XXXX-XXXX-XXXX-8870 |
| TYPE OF ACCOUNT: | REVOLVING ACCOUNT, CREDIT CARD |
| ECOA CODE: | CONSUMER DECEASED |
| UPDATED: | 12/2002 |
| BALANCE: | $1572 |
| REMARKS FIELD: | DECEASED |
| OPENED: | 11/1995 |
| MOST OWED: | $5211 |
| PAY TERMS: | MINIMUM $31 |
| CREDIT LIMIT: | $17000 |
| STATUS AS OF 12/2002: | PAID OR PAYING AS AGREED, IN PRIOR 48 MONTHS FROM LAST UPDATE NEVER LATE |

Id. at ¶ 44.  On that date, TU initiated a reinvestigation into the accuracy of the First USA Account by submitting an ACDV to First USA.  Id. at ¶ 45.

TU identified Plaintiff's dispute as follows: "Disputes Special Comment/Compliance Condition Code/narrative remarks. Verify accordingly." Id. at ¶ 46.  This was done because it is in the remarks message area that the deceased status was being reported.  Id. at ¶ 47.  In addition, TU included the following narrative: "Not Deceased."  Id. at ¶ 48.  TU submitted its ACDV to First USA via the E-OSCAR system.  Id. at ¶ 49.

First USA processed the ACDV on January 10, 2003.  (Kenworthy Aff., Ex. C at 67:1-10; 69:14-18).  First USA understood that Plaintiff was disputing the accuracy of the deceased status.  (See Kenworthy Aff., Ex. C at 76:10-14).  In

attempting to verify the deceased status of the Account, First USA's dispute operator checked the account records maintained on First USA's system.  Id. at 79:12-80:2.  However, First USA's system only gave that operator access to the Status Code.  Id.  The First USA system did not provide its operator with access to the Deceased Flag Field or ECOA code.  Id. at 79:12-80:2; 88:8-11 and 88:14-20.  Therefore, the operator could not see that First USA's Estates Department had failed to remove the deceased codes from the Deceased Flag Field and ECOA code.  Id.

First USA then responded to TU's ACDV by checking the box "Change Data As Shown" and changing the ECOA code from "X" to "1" standing for "individual." (Little Aff., ¶ 50 and Ex. B).  However, First USA failed to delete the "Deceased" remark in the Remarks Field by reporting an "XR" in the Compliance Condition Code field.  (Little Aff., ¶ 51).  Because First USA needed to change both the ECOA code and delete the Remarks Field in order to instruct TU's automated system to remove the deceased status from the First USA Account, the deceased status was not removed.  Id. at ¶ 52.

### (b)    Saks Reinvestigation (First)

On December 30, 2002, Saks was reporting the following information about Plaintiff's Saks Account:

```
ACCT NAME / NUMBER:     SAKS XXXX-XXXX-XXXX-5962
TYPE OF ACCOUNT:        REVOLVING CHARGE ACCOUNT
ECOA CODE:              CONSUMER DECEASED
UPDATED:                11/2002
BALANCE:                $0
```

OPENED:                         12/2000
MOST OWED:                      $337
PAID OFF:                       10/2002
CREDIT LIMIT:                   $1500
STATUS AS OF 10/2002:           PAYMENT AFTER CHARGE OFF/
                                COLLECTION

Id. at ¶ 53.   On December 30, 2002, TU initiated a reinvestigation into the accuracy of Saks Account by submitting an ACDV to Saks.   Id. at ¶ 54.

TU identified Plaintiff's dispute as follows: "Subscriber Comment / Remarks Message Disputed".   Id. at ¶ 55.   This was done because it is in the remarks message area that the deceased status was being reported.   Id. at ¶ 56.   In addition, TU included the following narrative: "Not Deceased."   Id. at ¶ 57.

On January 8, 2003, Saks responded by changing the ECOA code from "X" to " * " and included a narrative free-form response which stated: "no record of Peggy being deceased."   Id. at ¶ 58 and Ex. C.   Because Saks used a free-form response, the automated system rejected the ACDV transmission, and instead, required that a TU operator manually input the changes that Saks indicated on its response.   Id. at ¶ 59.   As a result, the operator manually changed the ECOA code from "X" to "I" in order to remove the deceased remark and therefore, conform with the narrative response conveyed by Saks.   Id. at ¶ 60.   TU's system had not generated a "Deceased" remark into the Remarks Field, therefore, Saks (unlike First USA) did not need to delete information in that field in order to remove all deceased indicators.   Id. at ¶ 61.

###### 2.      Second Dispute (Ownership)

On March 12, 2003, TU received a letter from Plaintiff's attorney, Thomas J. Lyons, Jr., dated March 5, 2003.  Id. at ¶ 65 and Ex. E.  In that letter Plaintiff's attorney disputed the accuracy of the First USA Account, the Saks Account and Chase NA Account No. XXXX-XXXX-XXXX-0193 (the "**Chase Account**").  Id. at ¶ 66, Ex. E.  However, this time, Plaintiff was not disputing the "deceased" status of the First USA (at this time still reporting a deceased status) and Saks (no longer reporting a deceased status) accounts.  Id. at ¶ 67.  Instead, by this second dispute letter, Plaintiff claimed that the First USA and Saks Accounts did not belong to her at all – in other words, she was disputing ownership of the Accounts.  Id. at ¶ 68.  Plaintiff also disputed ownership of the Chase Account. Id. at ¶ 69.  However, Plaintiff acknowledged during her deposition that the First USA and Saks Accounts do in fact belong to her.  (Kenworthy Aff., Ex. F at 76:1-6).

###### (a)      First USA Reinvestigation (Second)

On March 13, 2003, TU initiated an investigation into the accuracy of the First USA Account by submitting an ACDV to First USA via the E-OSCAR system.  (Little Aff., ¶ 70).  When TU transmitted this ACDV, it indicated to First USA the nature of Plaintiff's dispute by conveying the following dispute code: "Belongs to another individual with same or similar name.  Provide complete ID (incld SSN, DOB, Generation code, etc.)".  Id. at ¶ 71.  First USA returned its

18

ACDV to TU and therein verified that TU's reporting of the Account was accurate by checking the "Verified As Reported" box.  Id. at ¶ 72.

However, despite verifying the Account as accurate, First USA entered data into the fields where changes would normally be indicated if the furnisher were to check the box "Change Data As Shown".  Id. at ¶ 73.  Specifically, First USA attempted to change the ECOA code from "X" (standing for "consumer deceased") to an "I" (standing for "individual").  Id. at ¶ 74.  First USA also entered a code of "XR" into the Compliance Condition Code.  Id. at ¶ 75.  But, because First USA checked the box "Verified As Reported" instead of "Change Data As Shown" the changed codes were not submitted to TU and, therefore, not processed by its automated system.  Id. at ¶ 75.  First USA is aware that checking the wrong box will have such consequences.  (Kenworthy Aff., Ex. B 70:11-71:4).  Moreover, Trans Union's system alerted First USA about this issue through its alert window, see infra at 12-13, yet First USA chose to submit the response anyway.  (See Kenworthy Aff., Ex. B at 71:12-24).  Had First USA checked the appropriate box ("Change Data As Shown"), TU's system would have removed the "deceased" indicators from Plaintiff's First USA Account.  Id. at ¶ 76.

### (b)    Saks Reinvestigation (Second)

On March 13, 2003, TU initiated an investigation into the accuracy of the Saks Account by submitting an ACDV to Saks.  Id. at ¶ 77.  When TU transmitted this ACDV, it indicated the nature of Plaintiff's dispute by conveying the following

dispute code:  "Belongs to similar name.  Provide complete ID".  Id. at ¶ 78.

Saks returned its ACDV to TU and therein verified that TU's reporting of the

Account was accurate by checking the "Verified As Reported" box and by noting

that "Identification and account information correct as reported".  Id. at ¶ 79.  At

this time Saks was no longer reporting any deceased indicators since those

indicators were removed as a result of Plaintiff's first dispute of the Saks Account.

Id. at ¶ 80.

> **(c)    Chase Reinvestigation (First)**

On March 12, 2003, Chase was reporting the following information about

Plaintiff's Chase Account:

```
ACCT NAME / NUMBER:      CHASE NA XXXX-XXXX-XXXX-0193
TYPE OF ACCOUNT:         REVOLVING ACCOUNT / CREDIT CARD /
                         INDIVIDUAL ACCOUNT
ECOA CODE:               ACCOUNT CLOSED BY CUSTOMER
UPDATED:                 01/1999
BALANCE:                 $0
OPENED:                  07/1996
MOST OWED:               $2000
CREDIT LIMIT:            $2000
CLOSED:                  07/1997
STATUS AS OF 07/1997:    PAID OR PAYING AS AGREED, IN
                         PRIOR 13 MONTHS FROM DATE
                         CLOSED NEVER LATE
```

Id. at ¶ 81.

On March 13, 2003, TU initiated an investigation into the accuracy of the

Chase Account by submitting an ACDV to Chase.  Id. at ¶ 82.  When TU

transmitted this ACDV, it indicated the nature of Plaintiff's dispute by conveying

the following dispute code:  "Belongs to similar name.  Provide complete ID".  Id.

at ¶ 83.  Chase returned its ACDV to TU and therein verified that TU's reporting of the Account was accurate by checking the "Verified As Reported" box.  Id. at ¶ 84.

### 3.    Third Dispute (Accuracy Of Deceased Status)

On March 19, 2003, TU received another letter from Plaintiff's attorney, Thomas J. Lyons, Jr., dated March 10, 2003.  Id. at ¶ 86 and Ex. G.  Again, Plaintiff disputed the Saks and First USA reporting of deceased.  Id. at ¶ 88.  Plaintiff also acknowledged in this letter that the Saks and First USA accounts did in fact belong to her, contrary to her assertions in her March 5, 2003 letter.  Id. at ¶ 89, Ex. G.  Plaintiff again disputed ownership of the Chase Account claiming now that the account had been opened fraudulently.  Id. at ¶ 90, Ex. G.  Finally, Plaintiff also alleged that the Saks Account should not be reporting as a charge off.  Id. at ¶ 91, Ex. G.

At the time of this dispute, the Saks Account was not reporting "deceased" or as a charge off.  Id. at ¶ 92.  Therefore, no investigation was done on the Saks Account.  Id. at ¶ 93.  The First USA Account was still reporting "deceased".  Id. at ¶ 94.  And, the Chase Account was still reporting as Plaintiff's Account.  Id. at ¶ 95.

### (a)    First USA Reinvestigation (Third)

On March 21, 2003, TU investigated the First USA Account by submitting an ACDV to First USA.  Id. at ¶ 96.  The ACDV contained the following dispute code: "Special  Comment,  Compliance  Condition  and/or  remarks  message

disputed". Id. at ¶ 97. As with the Plaintiff's first dispute of the First USA Account, this dispute code was used because it is in the remarks that the deceased status was being reported. Id. at ¶ 99. In addition, TU included the following narrative: "Consumer Is Not Deceased." Id. at ¶ 100.

Again, First USA's system only gave the operator processing this dispute access to the Status Code. (Kenworthy Aff., Ex. C at 79:12 – 80:2; 88:8-11; 88:14-20). The First USA system did not give the operator access to the Deceased Flag Field or ECOA code. Id. Therefore, as with the first dispute, the operator could not see that First USA's Estates Department had failed to remove the deceased codes from the Deceased Flag Field and ECOA code. Id.

First USA then responded to TU's ACDV by checking the box "Change Data As Shown" without making any attempt to change either the ECOA code or the Remarks Field. (Little Aff., ¶ 101 and Ex. H). First USA only attempted to change the balance owing, high credit, and closed date. Id. at ¶ 102. When a furnisher marks the "Change Data As Shown" box but makes changes to some fields and not others, both TU and furnishers understand that the response is interpreted as a verification of the information that is left unchanged. Id. at ¶ 103. Therefore, TU's automated system did not remove the deceased status from the First USA Account. Id. at ¶ 104.

### (b)  Chase Reinvestigation (Second)

On March 21, 2003, TU investigated the Chase Account by submitting an ACDV to Chase. Id. at ¶ 105. The ACDV contained the following dispute code:

"Fraudulent Account".  Id. at ¶ 106.  Chase returned its ACDV to TU and checked the "Verified As Reported" box.  Id. at ¶ 107.

## III.   ARGUMENT

## A.   PLAINTIFF'S ALLEGED DAMAGES WERE CAUSED BY FIRST USA'S BREACH OF ITS FCRA DUTIES AND NOT BY ANY ALLEGED BREACH BY TU

### 1.   CRA Duties Under The FCRA

Plaintiff alleges TU negligently violated two provisions of the FCRA – Section 1681e(b) and Section 1681i of the FCRA by erroneously maintaining and reporting "deceased" on her First USA credit card account (the "**Account**"). Specifically, Plaintiff alleges that TU failed to act to remove the "deceased" notation at various times.  (See Complaint ¶¶ 92, 94, 96).  Before Plaintiff can prevail on her negligence claims she must first establish that TU had a duty to take the actions which Plaintiff alleges should have been taken – namely removal of the "deceased" status.  TU has no such duty under the FCRA.

The FCRA defines the duties and obligations of "consumer reporting agencies" such as TU.  The purpose of the FCRA is to "require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce…."  15 U.S.C. 1681(b) (emphasis added).  Among those procedures are certain "Compliance Procedures" which CRAs must follow with respect to the accuracy of consumer reports.  See generally, 15 U.S.C. 1681e.  "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning

23

the individual about whom the report relates".  15 U.S.C. 1681e(b).  The duty imposed upon agencies by this Section is that "reasonable procedures" must be maintained.  The FCRA does not impose a duty on agencies to prepare reports with 100% accuracy.  In fact, it is well established that the FCRA is not a strict liability statute.  Henson v. CSC Credit Services, 29 F.3d. 280, 284 (7th Cir. 1994); Cahlin v. General Motors Acceptance Corp., 936 F. 2d 1151, 1156 (11th Cir. 1991).

The FCRA also places a separate set of duties and obligations on CRAs relating  to consumer disputes of information contained in their consumer or credit file.  See generally, 15 U.S.C. 1681i.  Section 1681i(a) sets forth specific procedures CRAs must follow in conducting "reinvestigations" of information disputed by a consumer.  Specifically, when a consumer disputes the accuracy of an item of information contained in their file, the agency is required to reinvestigate free of charge and to either record the current status of the disputed information, or delete the item from the file before the end of the 30-day period, which begins on the date on which the agency receives the notice of the dispute from the consumer.  15 U.S.C. 1681i(a)(1)(A).  In addition, CRAs must provide prompt notice of a dispute to the furnisher of the credit information and delete or modify a disputed item of information if it is found to be inaccurate or incomplete or cannot be verified based on the results of the reinvestigation.  See 15 U.S.C. 1681i(a)(2) and 1681i(a)(5)(A).

## 2.    Furnisher Duties Under The FCRA

As part and parcel of a CRA's duties (and upon which such agencies rely) the FCRA also places strict duties and obligations upon "furnishers of information."   **Furnishers**" are the entities who report credit information to CRAs.  Under the FCRA, a furnisher has a variety of specific duties to "provide accurate information".  See generally, 15 U.S.C. 1681s-2.  CRA's can and do rely upon furnishers to comply with these provisions.  Specifically, the FCRA provides that:

> A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or consciously avoids knowing that the information is inaccurate.

15 U.S.C. 1681s-2(a)(1)(A).

> A person shall not furnish information relating to a consumer to any consumer reporting agency if (i) the person has been notified by the consumer … that specific information is inaccurate; and (ii) the information is, in fact, inaccurate.

15 U.S.C. 1681s-2(a)(1)(B).

> A person who (A) … furnishes information to one or more consumer reporting agencies about the person's transactions or experiences with any consumer; and (B) has furnished to a consumer reporting agency information that the person determines is not complete or accurate, shall promptly notify the consumer reporting agency of that determination and provide to the agency any corrections to that information, or any additional information, that is necessary to make the information provided by the person to the agency complete and accurate, and shall not thereafter furnish to the agency any of the information that remains not complete or accurate.

15 U.S.C. 1681s-2(a)(2).

In summary, once a furnisher is put on notice that information it has reported to a CRA is incomplete or inaccurate, it has a duty to cease reporting that information, promptly notify the CRA of the determination and properly provide any corrections to the CRA.

### 3.    First USA Breached Its Duties Under The FCRA

It is undisputed that First USA breached its FCRA duties in numerous respects.  To begin with, First USA was the source of the original mistake that lead to the inaccurate "deceased" codes being entered into Plaintiff's Account information.  On October 13, 2002, instead of applying the "deceased" codes to the account of Peggy L., First USA incorrectly applied them to Plaintiff Peggy M.'s Account.  (Kenworthy Aff., Ex. C at 33:8-18; 33:24-34:4; 36:24-38:1; 38:7-15; 40:8-41:1; 38:1-39:5; 39:18-23; and 40:8-12).

Twelve days later, on October 25, 2002, First USA was advised of its mistake in communications received from Peggy L's attorney and telephone disputes lodged by Plaintiff. (Kenworthy Aff., Ex. C at 46:11-47:4; 50:15-18; 55:10-24; 55:24-56:8; and 56:24-57:2).  As such, on October 25, 2002, First USA knew that the deceased information it had associated with Plaintiff's Account was inaccurate.  Id.  First USA made a failed effort to correct its records (see id. at 40:13-41:1; 54:7-55:7; and 57:5-59:1) when it failed to do enough to change the Account's internal "deceased flag" and resulting ECOA code.  (Kenworthy Aff., Ex. C at 61:13-16; 61:16-20; 62:1-63:13; and 63:11-13).

As a result, on November 5, 2002, First USA reported Plaintiff's Account to TU (for the first time) with a "deceased" ECOA code. (Kenworthy Aff., Ex. C at 33:3-7 and 56:8-21). Prior to that date and its October 13, 2002 misapplication of the deceased code, First USA was reporting the Account accurately to TU. (See Kenworthy Aff., Ex. C at 32:7-15). First USA admits that prior to November 5, 2002, it knew that the deceased information was inaccurate. It cannot be disputed that if First USA corrected its records or had not reported known inaccurate information, as it was required to do by the FCRA, the deceased information would never have been reported to TU. In turn, TU would never have maintained the Account as deceased as reported to it by First USA, would never have reported the deceased status to any third party and Plaintiff would have had no reason to dispute the Account with TU.

Not only did First USA breach its duty to not furnish information and cease furnishing information it knew to be inaccurate, it then failed (including by way of First USA's botched attempts to correct the information through the industry's dispute processing system) to notify TU that it had determined the information was inaccurate and failed to provide TU with the information necessary to make corrections to Plaintiff's Account. In fact, at all times from November 2002 until July 2004, First USA continued to report this knowingly inaccurate deceased information to TU in its monthly reports. (See Kenworthy Aff., Ex. C at 30:2-6; 30:7-11).

Moreover, TU requires furnishers, such as First USA, to provide written confirmation to TU each and every time they respond to one of TU's dispute investigation forms that they have corrected their internal records.  Specifically, those forms (Automated Dispute Verification Forms or ACDVs) all contain the following affirmation:  "When you sign this form you certify that you have verified the accuracy of the entire item and that your company's records will be adjusted to reflect the changes noted above."  Each of the dispute forms returned to TU by First USA in this case contained this affirmation.  (See Kenworthy Aff., Ex. I).  Despite these affirmations, First USA never corrected its records.

### 4.    Furnishers' FCRA Duties Limit The Liability Of CRAs

It is axiomatic that limits exist on the scope of duty and liability for tortious conduct.  The two primary legal doctrines that limit liability are duty and causation.  Duty is a legal question and when reasonable minds cannot disagree, proximate cause is also a question of law.  See Allianz Ins. Co. v. PM Services of Eden Prairie, Inc., 691 N.W.2d 79, 86 (Minn. Ct. App. 2005), citing Lubbers v. Anderson, 539 N.W.2d 398, 402 (Minn. 1995).

Each of Plaintiff's negligence claims require a showing of some reasonable connection between some act or omission of TU and the damage which the Plaintiff has allegedly suffered – i.e. that the act or omission is proven to be the "proximate" or "legal cause" of the damage.  See e.g. Mt. Healthy City School District Board Of Education v. Doyle, 429 U.S. 274, 285-87 (1977); Obabuki v. Choicepoint, 236 F.Supp.2d 278, 285 S.D.N.Y. (2002), quoting  Casella v.

Equifax Credit Information Services, 56 F.3d 469, 474-75 (2nd Cir. 1995) ("A court may properly reject a plaintiff's claims 'due to a lack of causation between the harm alleged' and a defendant's 'violations of the FCRA'").

In this case, it is First USA, if anyone, who bears the legal responsibility for Plaintiff's alleged damages.  The FCRA anticipates fact situations such as those and this case and does not place legal responsibility upon TU.  Such would be unjust because it would expose credit reporting agencies to liability for others' actions which, as expected, the FCRA places upon furnishers.  To hold otherwise would provide no sensible or just stopping point for an agency's duty and would impermissibly create strict liability contrary to law.

Instead, any proximate cause of Plaintiff's damages is First USA's breach of its FCRA duties by way of its repeated inaccurate reporting and its failure to cease such reporting or correct it.  Under the circumstances, there was nothing that TU could have done to prevent the "deceased" remark from appearing on the First USA Account.  This is because industry procedures are in accord with the FCRA and TU reasonably relied upon First USA complying with its obligations under the FCRA.

## B.    SECTION 1681e(b) – REASONABLE PROCEDURES

Section 1681e(b) requires that in preparing consumer reports, a CRA must follow "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  15 U.S.C. 1681e(b).  To sustain a claim under Section 1681e(b) Plaintiff must prove that

that inaccurate information was contained in her consumer report and that the inaccuracy was the result of TU's failure to follow reasonable procedures to assure accuracy.  Philbin v. TU Corp., 101 F.3d 957, 963 (3d. Cir. 1996).  When the reasonableness or unreasonableness of a CRA's procedures is beyond question summary judgment is appropriate.  Olwell v. Medical Information Bureau, No. Civ. 01-1481, 2003 WL 79035, *4 (D. Minn. Jan. 7, 2003); Sarver v. Experian Information Solutions, 390 F.3d 969, 971 (7th Cir. 2004); Crabill v. TU, LLC, 259 F.3d 662, 664 (7th Cir. 2001).  Plaintiff's Section 1681e(b) claim fails because she cannot prove the alleged inaccuracies were the result of TU's failure to follow reasonable procedures.

There is no doubt that the mistakes which originally caused the inaccurate reporting of "deceased" by First USA and Saks were unknown to Trans Union, beyond Trans Union's control, impossible to predict and, therefore, not the kind of mistakes that TU should be required to develop systems to prevent.  First USA and Saks applied the deceased information to the wrong Accounts.  This was an unlikely human error.  First USA then made matters worse when (after they realized their mistake) they failed to properly correct the problem in their system and failed in such a way as to hide the failure from their own dispute operators and allow their system to continue reporting the inaccurate information to TU on a monthly basis.

Recently, the Western District of Wisconsin, in Anderson v. Trans Union, LLC, et al., issued two written opinions in a case almost identical to this one.

See Anderson v. Trans Union, LLC, et al., 345 F.Supp.2d 963 (W.D. Wis. 2004)

("**Anderson I**") and Anderson v. Trans Union, LLC, et al., 2005 WL 1023322

(W.D. Wis.) ("**Anderson II**").   In Anderson, the "deceased" reporting was

perpetuated by an obscure flag maintained within the furnisher's system.  Just as

in the case, when the furnisher became aware of their misreporting they

attempted to remove the deceased indicators from their system.  And, just as in

this case, the furnisher failed, leaving a "deceased flag" which was not visible to

the furnisher's operators and resulted in continued knowing misreporting of the

inaccurate deceased information to the CRAs.  In that case, the Anderson Court

held that:

> It is evident that the mistakes that haunted the parties were
> anomalies and were not the kind of mistakes that a furnisher would
> make regularly or even frequently.  It would be unreasonable to
> require a consumer reporting agency to develop systems that would
> catch infrequent and irregular mistakes that furnishers might make.
> The Act does not impose such requirements.  Its goal is to have
> consumer reports that are fair and accurate; it does not demand
> perfection from an industry that deals in billions of pieces of
> information.
>
> Although courts should not countenance sloppy performance from
> consumer reporting agencies to tolerate inadequate procedures,
> they cannot hold consumer reporting agencies responsible for every
> problem a system can develop, including those that are novel and
> unanticipated.  Doing so would be a misreading of the statutory
> obligations imposed by the Act.

Anderson II, at 25-26.   The Anderson holding and rationale are given even

greater weight when considering the recent Seventh Circuit opinion in Sarver.

In <u>Sarver</u> the Seventh Circuit held that in the absence of notice of prevalent unreliable information from a furnisher, which would put the CRA on notice that systemic problems existed within its system, the Court would not find that the CRA had failed to maintain reasonable procedures when it failed to discover an anomalous inaccurately reported bankruptcy remark.  <u>Sarver</u>, 390 F.3d 969 at , 972-3.  The <u>Sarver</u> Court held that to do so would be unreasonable given the enormous volume of information the CRA processes daily and the enormous cost that would be incurred if the CRA were required to examine every entry individually.  <u>Id</u>.

Here there is no evidence TU knew or should have known that the information it was receiving from First USA or Saks was unreliable or that any type of systemic problem existed.  In fact, the only evidence is that First USA and Saks are known by TU to be reliable sources of credit information.  TU cannot be liable for inaccuracies of which it has no notice.  To hold otherwise would be to require Trans Union to verify the accuracy of every item reporting "deceased" information.  Trans Union maintains more than five million tradelines which are reporting a deceased code and of those files which contain tradelines reporting deceased more than two million contain only one tradeline reporting deceased.  There are more than eleven thousand Trans Union subscribers reporting at least one tradeline with a deceased code.   The cost to Trans Union would be enormous if it were required to launch (at its own initiative) an investigation into each of these tradelines.  Further, such a finding would require Trans Union (and

the other CRAs) to squander considerable resources searching for the proverbial "needle in a hay stack" – i.e. those anomalous or obscure human errors that might cause the type of mistakes made in this case.

In any event, TU has produced undisputed evidence that its procedures were compliant with its duties under the FCRA and reasonable as a matter of law. TU has multiple procedures to check the accuracy of the information furnishers report. TU conducts training for furnishers. It conducts audits of furnisher data before and after they are permitted to transmit information. TU has systems which will alert it of unusual numbers of complaints or a higher than expected number of "conditions", such as "deceased" showing up in a furnisher's reporting.

As in Anderson, and despite these procedures, First USA's and Saks' errors made their way into TU's database and defied First USA's and TU's efforts to eliminate them. However, a CRA is not liable under the FCRA if it followed reasonable procedures to assure accuracy but reported inaccurate information on a consumer's report nonetheless. Sarver, 390 F.3d at 971-72; Henson v. CSC Credit Services, 29 F.3d 280, 284 (7th Cir. 1994); see also Anderson I and Anderson II. In this case, the error's persistence in Plaintiff's consumer reports simply cannot be attributed to TU's failure to have reasonable procedures in place to assure accuracy. TU satisfied its statutory obligations.

## C.     SECTION 1681i – REINVESTIGATIONS

### 1.     The First USA Account

Plaintiff contends TU's reinvestigations did not comply with Section 1681i of the FCRA.  Section 1681i(a) requires a CRA to reinvestigate the completeness or accuracy of any item of information contained in a consumer's file if the agency receives notice from the consumer that he is disputing the item.  Section 1681i does not prescribe the manner in which reinvestigations are to be carried out, though it sets forth certain processes that CRAs must follow.

Plaintiffs have not shown that TU failed to follow any of the particular processes set forth in the statute.  Instead, Plaintiff has only her contention that TU's reinvestigations violated the statute simply because they failed to discover the inaccurate deceased notation which was imported into Plaintiff's account by the human error that resulted in the incomplete correction of First USA's records.

Plaintiff disputed the deceased remarks being reported by First USA on two occasions.  Each time TU fulfilled its obligations under Section 1681i in the processing of those disputes.  First, TU notified First USA of Plaintiff's dispute through its ACDV system, providing it with all relevant information available to it – namely that Plaintiff claimed the deceased remarks were reported in error.  See Lee, 2003 WL 22287351, at 6 (N.D. Ill. 2003) (holding that the ACDV process itself is accepted as an adequate method of reinvestigating disputes under Section 1681i).  The question TU was asking First USA to answer was whether

34

the Plaintiff was alive or dead.  This is something that the furnisher, First USA, is in the best position to verify and which TU can reasonably rely on to verify.  See Anderson II at 7.   It is First USA that has the relationship with the consumer – not TU.  Moreover, it has the means of checking the consumer's status and it certainly has the motivation to do so.  Id.  As the Anderson Court insightfully noted, "[i]f someone is using credit cards of a person who is deceased, who has a stronger reason to check the legitimacy of such use but the issuer who may be held liable for any fraudulent charges?"  Id.

Each time, TU received responses from First USA it correctly processed those responses.  Then TU notified Plaintiff of the results.  The only reason the deceased remarks were not removed as a result of either of these reinvestigations was that First USA botched each of its ACDV responses.

First USA's first response failed because First USA only removed the deceased remark from the ECOA code instead of removing it from both the ECOA code and the Remarks Field.  This happened despite the fact that First USA knew exactly what changes it needed to make in order to ensure the remarks would be deleted – i.e. that the ECOA code would have to be changed from "X" to "I" and the Remarks Field would have to be deleted by returning an "XR" in the Compliance Condition Code.

It is undisputed that First USA had this knowledge since it attempted to make exactly those changes when it responded to Plaintiff's (mistakenly made) dispute regarding ownership.  The only reason the changes did not take effect is

because First USA checked the wrong box ("verified as reported" instead of "change data as shown") overriding the TU system warning that any changes would not be made if the "verified as reported" box had been checked.

First USA's second ACDV response also failed.  This time the response failed because First USA made no effort whatsoever to change either the ECOA code or the Remarks Field.  Instead, First USA actually verified that the deceased remarks were being accurately reported.

On these facts, no jury could conclude that TU's reinvestigations were unreasonable or that TU failed to follow the procedures set forth in Section 1681i. Once TU gave notice of Plaintiff's disputes to First USA, it became First USA's duty under the FCRA to determine whether Plaintiff had died and report back to TU.  Here, that determination had already been made by First USA at the time TU sent its first ACDV.  Were it not for First USA's repeated failed attempts to properly respond to TU's reinvestigations, the deceased reporting would have been removed.

In some circumstances, the duty to reinvestigate may include a duty to go beyond the original source of information and conduct an independent investigation.  Henson, 29 F.3d at 287.  The Court must look to two factors to determine whether TU had a duty to take these additional steps in its reinvestigation: (1) "Whether the consumer has alerted the reporting agency to the possibility that the source may be unreliable or the reporting agency itself knows or should know that the source may be unreliable", and (2) "the cost of

verifying the accuracy of the source versus the possible harm inaccurately reported information may cause the consumer." Henson, 29 F.3d at 287.

However, Plaintiff has presented no evidence that TU had any reason to question First USA's reliability.  Instead, it is undisputed that TU's experience with First USA is that they are a reliable source of credit information.  Further, again as the Anderson Court held, requiring additional investigation obligations for questionable deceased notations would be an unreasonable burden "particularly given the number of consumers who die each day." Anderson I, at 972.

Plaintiff's position is nothing more than a transparent attempt to place strict liability on TU.  However, the FCRA is not a strict liability statute.  See Sarver v. Experian Information Solutions, 390 F.3d 969, 971 (7th Cir. 2004); followed by Anderson I and Anderson II.  A CRA's obligation under the FCRA is to employ *reasonable* procedures, not perfect ones.  Id.  Given the complexity of the consumer credit reporting system and the volume of information involved, an inaccuracy does not render the procedures unreasonable.  Id.  TU's failure to catch the inaccurate notation that was imported into Plaintiff's account and the human error that resulted in the incomplete correction of its records do not show that its procedures were unreasonable.  Anderson II at 12.

## 2.   The Saks Account

Presumably Plaintiff does not complain about TU's reinvestigation of the Saks Account since that reinvestigation resulted in the permanent removal of the

deceased remarks being reported by Saks.   Therefore, no more regarding that reinvestigation will be said here.

### 3.     The Chase Account

Plaintiff also disputed ownership of the Chase Account on two separate occasions, both occurring within a week of each other: March 12, 2003 and March 19, 2003.  In each instance, TU forwarded an ACDV to Chase indicating that Plaintiff disputed ownership.  Each time, Chase responded by verifying that the account information was accurate as reported.  TU mailed Plaintiff the results of these reinvestigations.

The Chase Account contained no adverse credit information - making it impossible that Plaintiff could have been damaged by this reporting in any event.  Further, TU had not received any information suggesting that Chase was not a reliable source of information and had no reason to believe that Chase had not conducted a thorough investigation of this Account.   Thus, as to the Chase Account, TU's actions were reasonable and at all times, in conformity with Section 1681i.

## D.     PLAINTIFF HAS NOT SUFFERED ANY ACTUAL DAMAGES

Even if TU's procedures are not found reasonable as a matter of law, Plaintiff's Section 1681e(b) claim still fails because she has no evidence of damages.  As to TU, Plaintiff claims that she has suffered damages in the form of two (2) credit denials and emotional damages.  Plaintiff maintains that she was denied credit by Mortgage Plus Financial Corp. ("**Mortgage Plus**") and Toyota

Motor Credit Corp. ("**Toyota**") because of inaccurate information contained on her TU consumer report.  This is simply not true.

Mortgage Plus actually secured approval of Plaintiff's application through a lender (i.e., Guaranty Residential Lending) at the terms Plaintiff was requesting. (Kenworthy Aff., Ex. A at 28:2-25; 59:22 – 60:8).  Interestingly, Plaintiff did not close on this loan, but instead, withdrew her application once she was notified of her approval.  (Kenworthy Aff., Ex. A at 35:8 – 36:4).  In fact, the individual that Plaintiff dealt with at Mortgage Plus – Mr. Kevin Johanson – found Plaintiff's actions to be most unusual under the circumstances, and at one point, thought that Plaintiff probably never actually intended to close on a loan arranged by Mortgage Plus.  Id. at 124:15 – 125:17.  Apparently, it appeared Plaintiff was attempting to improperly "trump up" a case and damages against defendants.

In any event, Mortgage Plus is a mortgage brokerage company that Plaintiff used while trying to refinance her mortgage.  As a broker, Mortgage Plus neither provides lending services nor makes the credit decision as to whether to approve or deny a prospective applicant.  Id. at 12:11-22 (stating that as to Mortgage Plus "[w]e don't approve or deny anyone of credit.").  If an applicant is denied credit, that decision is made by the lender, and it is the lender that sends the applicant the requisite ECOA denial letter.  Id.  Therefore, it is impossible for Mortgage Plus to have denied credit to Plaintiff.

Similarly, Plaintiff was not denied credit by Toyota.  (Kenworthy Aff., Ex. G at 41:16-20).  Plaintiff references a transaction involving the purchase of a new

vehicle at Maplewood Toyota.  (Kenworthy Aff., Ex. G at 37:7-10).  Plaintiff's application was underlined approved, and she obtained the financing of her vehicle at the terms sought, the rate of 2.9% with monthly payments of $415.00.  (Kenworthy Aff., Ex. G at 39:12-15; 40:7-10).

Finally, Plaintiff's alleged emotional damages consist of nothing more than the usual vague and conclusory statements often paraded in cases where no liability or causation exists.  Plaintiff claims to have suffered anxiety, loss of concentration, irritability, humiliation, embarrassment, and frustration.  (See Kenworthy Aff.,Ex. H, Nos. 10 and 11).  When asked to describe what she meant by these damages during her deposition, the only symptoms that Plaintiff could describe were crying, upset stomach, and that she had "probably snapped at a few people here and there."  (Kenworthy Aff., Ex. F at 144-154).  During her deposition, Plaintiff also admitted that she had no way of knowing which of these emotional damages were attributable to TU and which were attributable to the other defendants.  *Id*.  Plaintiff also admitted that she didn't think it was necessary to seek any professional treatment for any of these symptoms.  Id. at 153:17-20.  In any event, Plaintiff has no evidence that any of these "symptoms" were actually caused by TU.

Because emotional damages are so easy to manufacture, courts have imposed a strict standard to be applied for them to be recoverable.  Sarver, 390 F.3d at 971; Aiello v. Providian Fin. Corp., 239 F.3d 876, 880 (7th Cir. 2001). Reed v. Experian, 321 F. Supp. 2d 1109 (D. Minn. 1004).  When the plaintiff's

testimony is the only proof of emotional damages, he or she must explain the circumstances of the injury in reasonable detail and cannot simply rely on conclusory statements.  <u>Sarver</u>, 390 F.3d at 971.

## E.   WILLFUL VIOLATION CLAIMS

To recover punitive damages under the FCRA, Plaintiff must show that TU willfully failed to comply with the FCRA.  15 U.S.C. 1681n.  To prove willfulness, Plaintiff carries the heavy burden of showing that TU knowingly and intentionally committed an act in conscious disregard for the rights of others.  <u>See</u> <u>Casella v. Equifax</u>, 56 F3d 469, 476 (2nd Cir. 1995); <u>Phillips v. Grendahl</u>, 312 F.3d 357, 368 (8th Cir. 2002) (The term "willfully," as used in the FCRA imports the requirement that the defendant know his or her conduct is unlawful); <u>Bakker v. McKinnon</u>, 152 F.3d 1007, 1013 (8th Cir. 1998).  In addition, only defendants who engaged in willful misrepresentations or concealments have committed a willful violation of the FCRA and are subject to liability under §1681n.  <u>Stevenson v. TRW, Inc.</u>, 987 F.2d 288, 293 (5th Cir. 1993); <u>See also</u> <u>Cushman v. TU Corp.</u>, 115 F.3d 220, 227 (3d Cir. 1997).

There is no genuine issue of material fact in the instant matter because Plaintiff has no evidence of willful conduct.  It is undisputed that TU complied with each of Plaintiff's requests for reinvestigation and provided Plaintiff with the results of those investigations.  Plaintiff has no evidence that TU acted with knowledge or reckless disregard for the truth or falsity of any information in her consumer file.  On the contrary, TU attempted to ensure a proper and accurate

reinvestigation.   Such conduct proves that the defendant does not possess a willful intent to injure the Plaintiff.   TU neither knowingly misrepresented nor concealed Plaintiff's consumer report from him.   Thus Plaintiff's claim for punitive damages fails and should be dismissed.

## F.   CREDIT DEFAMATION CLAIMS ARE PREEMPTED BY THE FCRA

Plaintiff's credit defamation claim is preempted by the FCRA because the information upon which it is based was provided to Plaintiff pursuant to Section 1681g of the FCRA which provides a safe harbor and because there is no evidence that TU furnished the inaccurate information with malice or willful intent to injure Plaintiff.   Section 1681h(e) of the FCRA provides a qualified immunity for CRAs from defamation claims for information disclosed pursuant to Section 1681g except as to false information furnished with malice or with willful intent to injure. Wiggins v. District Cablevision, Inc., 853 F.Supp. 484 (D.C. 1994); see also Thornton v. Equifax, Inc., 619 F.2d 700 (8th Cir. 1980), cert. denied, 449 U.S. 835 (1980).   "The malice or willful intent to injure contemplated by 1681h(e) is of a higher degree than that which supports a claim of statutory or punitive damages under 1681n." Reed, 321 F.Supp.2d at 1117.

As discussed previously, Plaintiff has no evidence that TU acted with the requisite willful intent necessary for Section 1681n.   In the absence of evidence necessary for a claim under the lower standard of Section 1681n, Plaintiff necessarily fails to overcome the qualified immunity afforded by Section 1681h(e).   Plaintiff has nothing more than the conclusory wording of her

complaint to support her contentions.  In the absence of evidence to create an issue of fact, TU should be granted summary judgment on this Count.

Further, Plaintiff alleges that she first learned of the derogatory information from a mortgage company.  (Complaint, ¶ 45).  Thereafter, Plaintiff disputed information with TU, and on January 11, 2003, TU provided Plaintiff with a copy of her report as required by Section 1681g.  Therefore, because TU disclosed the derogatory information to Plaintiff pursuant to Section 1681g, Plaintiff's credit defamation claim is preempted by Section 1681h(e).

## VII.  **CONCLUSION**

For all of the foregoing reasons, TU requests that the Court grant summary judgment in its favor and dismiss Plaintiff's claims against TU, and for all other relief just and proper in the premises.

Respectfully submitted,

*s/ G. John Cento*
G. John Cento, Esq.
Brian S. Kenworthy, Esq.
KATZ & KORIN, P.C.
334 North Senate Avenue
The Emelie Building
Indianapolis, Indiana  46204-2964
Office: (317) 464-1100
Fax: (317) 464-1111
gjcento@katzkorin.com
bkenworthy@katzkorin.com

*Lead Counsel for Trans Union, LLC*

Dated: May 10, 2005

## CERTIFICATE OF COMPLIANCE[4]

I hereby certify that this Memorandum of Law conforms to the requirements of LR 7.1(c) and (e). This Memorandum of Law was prepared using Microsoft Office Word 2003 and is produced using 13-point font. The length of this Memorandum of Law is 10,656 words. The work count of the work processing program has been applied specifically to include all text, including headings, footnotes, and quotations.

Respectfully submitted,

*s/ G. John Cento*
G. John Cento
Brian S. Kenworthy
KATZ & KORIN, P.C.
The Emelie Building
334 North Senate Avenue
Indianapolis, IN  46204-1708
Office:  (317) 464-1100

---

[4] TU has confirmed with the Court's Calendar Clerk that it is permissible to submit its Memorandum of Law in Support of its Motion for Summary Judgment in accordance with the newly amended L.R. 7.1(c) and (e).