# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

PEGGY MARIE SCHMITT,   CASE NO. 03-3295 ADM/AJB

    Plaintiff,

v.

CHASE MANHATTAN BANK NA, et al.,

    Defendants.

## AFFIDAVIT OF EILEEN LITTLE

I, Eileen Little, hereby declare under the penalty of perjury under the laws of the United States of America that the following is true and correct:

1. I am Group Manager of Consumer Relations for Trans Union, LLC ("**Trans Union**"), am authorized to make this affidavit on their behalf and have first hand knowledge of the matters contained herein including receipt and processing of consumer disputes and investigation thereof.

2. Trans Union maintains procedures to conduct reinvestigations of disputes. In general, when Trans Union receives a dispute from a consumer, Trans Union investigates the dispute using one of two systems developed for the purpose of processing and tracking disputes; the Consumer Dispute Verification process ("**CDV**"), and the Automated Consumer Dispute Verification process ("**ACDV**").

3. Through these systems, Trans Union sends to the furnisher the information that Trans Union is currently reporting about the consumer, tells the creditor what the consumer's dispute is, and asks the creditor to investigate the information it has concerning the relationship it has with the consumer and determine whether the information that it is reporting to Trans Union is correct and complete.

4. The furnisher is also asked to verify that the indicative information Trans Union has on the consumer matches the indicative information maintained in the furnisher's records and to verify that it is associated with the particular account being disputed.[1]

5. This process leads to one of three general outcomes:

1. The creditor reports back to Trans Union that the information is indeed correct. In that case, Trans Union considers the creditor's verification along with any information that the consumer supplied and either revises the consumer's credit report or leaves the report unchanged, as is appropriate under the circumstances.

2. The creditor reports back to Trans Union that the information is erroneous. In that case, Trans Union either deletes or modifies the information on the credit report, as appropriate.

3. The creditor does not respond to Trans Union within the required time. In that case, where appropriate, Trans Union deletes the disputed item from the consumer's credit report as unverifiable.

---

[1] "Indicative information" refers to general information regarding a consumer such as name, address, social security number, date of birth, etc.

2

6. Regardless of the outcome of its reinvestigation, Trans Union notifies the consumer of the results of the reinvestigation.

7. In addition, Trans Union always gives the consumer the chance to insert into the credit report a statement regarding the information the he or she disputes.

8. Trans Union may also use additional procedures in individual cases depending on the precise dispute involved and the circumstances of the case.

9. The CDV and ACDV are industry standard systems designed by an international trade organization known as the Consumer Data Industry Association ("**CDIA**").

10. ACDVs are transmitted to furnishers via an electronic system known as the "E-OSCAR" system. E-OSCAR was created by the CDIA, in cooperation with Equifax, Experian, Innovis and Trans Union.

11. E-OSCAR is a web-based, Metro 2 compliant, automated system that enables furnishers and consumer reporting agencies to create and respond to consumer credit history disputes.

12. E-OSCAR supports two primary processes: the ACDV process and the AUD process.

13. The ACDV process tracks and manages an ACDV initiated by a consumer reporting agency on behalf of a consumer and routes it to the appropriate furnisher.

14. The furnisher returns the ACDV to the initiating consumer reporting agency with the updated information (if any) relating to the consumer's credit history.

15. The AUD process is an automated process for handling out-of-cycle credit history update requests submitted by furnishers.

16. A furnisher may update a consumer's credit information by submitting an AUD record. The furnisher uses the system's web-based interactive interface to create the AUD record and to route it to one or more consumer reporting agency.

17. The intent of the E-OSCAR AUD process is to provide the consumer reporting agency with a correction to a consumer's file that must be handled outside of the regular activity reporting cycle process.

18. In responding to an ACDV, a furnisher informs Trans Union that either the disputed information is "Verified" or that the disputed information should be "Changed" or that the disputed item of information should be "Deleted".

19. To do this the furnisher literally checks a box.

20. If a furnisher chooses to verify the information it will check a box called "Verified As Reported".

21. Once checked, this will instruct the consumer reporting agency that all information about the disputed tradeline is, in fact, accurate and that no changes should be made.

22. If a furnisher chooses to change information it will check a box called "Change Data As Show" and then will input changes into the various fields of information that need to be changed.

23. However, if a furnisher selects to check the Verified As Reported box but then also inputs changes into the various data fields, they are provided with an alert.

24. The alert (which appears as a pop-up window in their system) reads:

The response you selected is 1 [Verified As Reported] – Account information accurate as date reported. If you have entered any information on the Account Information, or Associated Consumer screens it will not be transmitted to the Credit Reporting Agency. By submitting this verification, you certify that you have verified the accuracy of the entire item in compliance with all legal requirements and your computer and/or manual records will be adjusted to reflect changes noted.

25. In order for the furnisher to complete processing of the ACDV, it must submit through this window.

26. Otherwise, it can cancel at this point and make changes or corrections to its ACDV response.

27. Once Trans Union receives the CDV or ACDV back from the furnisher, Trans Union records the current status of that information on the consumer's credit file.

28. For example, if the furnisher verifies the information, then Trans Union maintains the information as it exists on Trans Union's files.

29. Depending on a particular consumer dispute or the circumstances surrounding a particular case, Trans Union may use additional investigative procedures as well.

30. Another procedure utilized by Trans Union in order to maintain accuracy of the information that it reports is the Universal Data Form ("**UDF**") and the Automated Universal Data form ("**AUD**").

31. Both of these processes enable a furnisher to change particular account information prior to the time in which it submits its monthly updates of data to Trans Union.

32. This allows both the furnishers and Trans Union to make specific changes to a consumer's file while at the same time keep the consumer's accounts reasonably current.

33. Whenever a furnisher directs Trans Union to change information on a consumer's credit file – whether using a CDV, ACDV, AUD, or UDF, that furnisher affirms to Trans Union that it has made the same changes to its own systems.

34. This affirmation is made by the furnisher on the form used to process the dispute.

35. Trans Union provides the consumer with the opportunity to have a 100-word consumer statement regarding the information inserted into the consumer's file in accordance with 15 U.S.C. 1681i(b) and that Trans Union will assist them in writing such a statement.

36. Trans Union also recommends to consumers that when they have a dispute pending they should not apply for credit, as the results of the reinvestigation may affect a new credit decision.

37. Trans Union may employ additional or different procedures for processing disputes depending on the precise dispute involved and the circumstances of the case.

38. Finally, Trans Union monitors how its furnishers respond to disputes and tracks furnisher dispute histories.

39. Trans Union has reviewed the responses to consumer disputes and dispute histories of First USA (a/k/a Bank One), Saks, and Chase and those furnishers are reliable dispute responders. Further, Trans Union has received no notice of systemic problems with these furnishers.

40. On December 26, 2002, Trans Union received a letter from Plaintiff dated December 20, 2002. A copy of the December 20, 2002 letter is attached hereto as <u>Exhibit A</u>.

41. Plaintiff's letter indicated that some of Plaintiff's creditors were reporting her as deceased and that this was incorrect.

42. On December 30, 2002, Trans Union inspected Plaintiff's credit file and determined that two of Plaintiff's creditors were reporting Plaintiff's accounts with a deceased status – First USA and Saks.

43. None of Plaintiff's other accounts were reporting with a deceased status.

44. On December 30, 2002, First USA was reporting the following information about Plaintiff's First USA Account:

| | |
|---|---|
| ACCT NAME / NUMBER: | FIRST USA XXXX-XXXX-XXXX-8870 |
| TYPE OF ACCOUNT: | REVOLVING ACCOUNT, CREDIT CARD |
| ECOA CODE: | CONSUMER DECEASED |
| UPDATED: | 12/2002 |
| BALANCE: | $1572 |
| REMARKS FIELD: | DECEASED |
| OPENED: | 11/1995 |
| MOST OWED: | $5211 |
| PAY TERMS: | MINIMUM $31 |
| CREDIT LIMIT: | $17000 |
| STATUS AS OF 12/2002: | PAID OR PAYING AS AGREED, IN PRIOR 48 MONTHS FROM LAST UPDATE NEVER LATE |

45. On that date, Trans Union initiated a reinvestigation into the accuracy of the First USA Account by submitting an ACDV to First USA.

46. Trans Union identified Plaintiff's dispute as follows: "Disputes Special Comment/Compliance Condition Code/narrative remarks. Verify accordingly."

47. This was done because it is in the remarks that the deceased status was being reported.

48. In addition, Trans Union included the following narrative: "Not Deceased."

49. Trans Union submitted its ACDV to First USA via the E-OSCAR system.

50. First USA then responded to Trans Union's ACDV by checking the box "Change Data As Shown" and changing the ECOA code from to "1" standing

8

for "individual". A copy of the First USA ACDV dated January 10, 2003 is attached hereto and made a part hereof as <u>Exhibit B</u>.

51.  However, First USA failed to delete the "Deceased" remark in the Remarks Field by reporting an "XR" in the Compliance Condition Code field.

52.  Because First USA needed to change both the ECOA code and delete the Remarks Field in order to instruct Trans Union's automated system to remove the deceased status from the First USA Account, the deceased status was not removed by Trans Union.

53.  On December 30, 2002, Saks was reporting the following information about Plaintiff's Saks Account:

| | |
|---|---|
| ACCT NAME / NUMBER: | SAKS XXXX-XXXX-XXXX-5962 |
| TYPE OF ACCOUNT: | REVOLVING CHARGE ACCOUNT |
| ECOA CODE: | CONSUMER DECEASED |
| UPDATED: | 11/2002 |
| BALANCE: | $0 |
| OPENED: | 12/2000 |
| MOST OWED: | $337 |
| PAID OFF: | 10/2002 |
| CREDIT LIMIT: | $1500 |
| STATUS AS OF 10/2002: | PAYMENT AFTER CHARGE OFF/ COLLECTION |

54.  On December 30, 2002, Trans Union initiated a reinvestigation into the accuracy of Saks Account by submitting an ACDV to Saks.

55.  Trans Union identified Plaintiff's dispute as follows: "Subscriber Comment / Remarks Message Disputed".

56.  This was done because it is in the remarks that the deceased status was being reported.

9

57.  In addition, Trans Union included the following narrative: "Not Deceased."

58.  On January 8, 2003, Saks responded by changing the ECOA code from "X" to "*" and included a narrative free-form response which stated: "no record of Peggy being deceased." A copy of the Saks ACDV dated January 8, 2003 is attached hereto and made a part hereof as <u>Exhibit C</u>.

59.  Because Saks used a free-form response, the automated system rejected the ACDV transmission, and instead, required that a Trans Union operator manually input the changes that Saks indicated on its response.

60.  As a result, the operator manually changed the ECOA code from "X" to "I" in order to remove the deceased remark and therefore, conform with the narrative response conveyed by Saks.

61.  Trans Union's system had not generated a "Deceased" remark into the Remarks Field, therefore, Saks (unlike First USA) did not need to delete information in that field in order to remove all deceased indicators.

62.  On January 11, 2003, Trans Union mailed Plaintiff the results of these reinvestigations along with her current Trans Union consumer disclosure dated January 11, 2003.

63.  Plaintiff's January 11, 2003 Investigation Results are attached hereto and made a part hereof as <u>Exhibit D</u>.

64. The investigation results confirmed to Plaintiff that the deceased status had been removed from the Saks Account but not from the First USA Account.

65. On March 12, 2003, Trans Union received a letter from Plaintiff's attorney, Thomas J. Lyons, Jr., dated March 5, 2003. A copy of the March 5, 2003 letter from Plaintiff's attorney to Trans Union is attached hereto and made a part hereof as Exhibit E.

66. In that letter Plaintiff's attorney disputed the accuracy of the First USA Account, the Saks Account and of a Chase NA Account No. XXXX-XXXX-XXXX-0193 (the "**Chase Account**").

67. However, this time, Plaintiff was not disputing the "deceased" status of the First USA (at this time still reporting a deceased status) and Saks Accounts (no longer reporting a deceased status).

68. Instead, by this second dispute letter, Plaintiff claimed that the First USA and Saks Accounts did not belong to her at all – in other words, she was disputing ownership of the Accounts.

69. Plaintiff also disputed ownership of the Chase Account.

70. On March 13, 2003, Trans Union initiated an investigation into the accuracy of the First USA Account by submitting an ACDV to First USA via the E-OSCAR system.

71. When Trans Union transmitted this ACDV, it indicated to First USA the nature of Plaintiff's dispute by conveying the following dispute code:

11

"Belongs to another individual with same or similar name. Provide complete ID (include SSN, DOB, Generation code, etc.)".

72.     First USA returned its ACDV to Trans Union and therein verified that Trans Union's reporting of the Account was accurate by checking the "Verified As Reported" box.

73.     However, despite verifying the Account as accurate, First USA entered data into the fields where changes would normally be indicated if the furnisher's were to check the box "Change Data As Show".

74.     Specifically, First USA attempted to change the ECOA code from "X" (standing for "consumer deceased") to an "I" (standing for "individual").

75.     First USA also entered a code of "XR" into the Compliance Condition Code. But, because First USA checked the box "Verified As Reported" instead of "Change Data As Shown" the changed codes were not submitted to Trans Union and, therefore, not processed by its automated system.

76.     Had First USA checked the appropriate box ("Change Data As Shown"), Trans Union's system would have removed the "deceased" indicators from Plaintiff's First USA Account.

77.     On March 13, 2003, Trans Union initiated an investigation into the accuracy of the Saks Account by submitting an ACDV to Saks.

78.     When Trans Union transmitted this ACDV, it indicated to Saks the nature of Plaintiff's dispute by conveying the following dispute code: "Belongs to similar name. Provide complete ID".

12

79. Saks returned its ACDV to Trans Union and therein verified that Trans Union's reporting of the Account was accurate by checking the "Verified As Reported" box and by noting that "Identification and account information correct as reported".

80. At this time Saks was no longer reporting any deceased indicators since those indicators were removed as a result of Plaintiff's first dispute of the Saks Account.

81. On March 12, 2003, Chase was reporting the following information about Plaintiff's Chase Account:

| | |
|---|---|
| ACCT NAME / NUMBER: | CHASE NA XXXX-XXXX-XXXX-0193 |
| TYPE OF ACCOUNT: | REVOLVING ACCOUNT / CREDIT CARD / INDIVIDUAL ACCOUNT |
| ECOA CODE: | ACCOUNT CLOSED BY CUSTOMER |
| UPDATED: | 01/1999 |
| BALANCE: | $0 |
| OPENED: | 07/1996 |
| MOST OWED: | $2000 |
| CREDIT LIMIT: | $2000 |
| CLOSED: | 07/1997 |
| STATUS AS OF 07/1997: | PAID OR PAYING AS AGREED, IN PRIOR 13 MONTHS FROM DATE CLOSED NEVER LATE |

82. On March 13, 2003, Trans Union initiated an investigation into the accuracy of the Chase Account by submitting an ACDV to Chase.

83. When Trans Union transmitted this ACDV, it indicated to Chase the nature of Plaintiff's dispute by conveying the following dispute code: "Belongs to similar name. Provide complete ID".

84. Chase returned its ACDV to Trans Union and therein verified that Trans Union's reporting of the Account was accurate by checking the "Verified As Reported" box.

85. On March 21, 2003, Trans Union mailed Plaintiff the results of this reinvestigation, which also contained a Trans Union consumer disclosure dated March 21, 2003. Plaintiff's March 21, 2003 Investigation Results are attached hereto and made a part hereof as Exhibit F.

86. On March 19, 2003, Trans Union received another letter from Plaintiff's attorney, Thomas J. Lyons, Jr., this one dated March 10, 2003.

87. A copy of the March 10, 2003 letter from Plaintiff's attorney to Trans Union is attached hereto as Exhibit G.

88. Again, Plaintiff disputed that the Saks Account and First USA account should not be reporting with a deceased status.

89. Plaintiff also acknowledged in this letter that the Saks and First USA accounts did in fact belong to her contrary to her assertions in her March 5, 2003 letter.

90. Plaintiff also again disputed ownership of the Chase Account claiming now that the account had been opened fraudulently.

91. Finally, Plaintiff also alleged in her dispute letter that the Saks Account should not be reporting as a charge off.

92. At the time of this dispute, the Saks Account was not reporting "deceased" indicators or as a charge off.

93. Therefore, no investigation was done on the Saks Account.

94. The First USA Account was still reporting "deceased" indicators.

95. And, the Chase Account was still reporting as it was at the time of Plaintiff's previous dispute.

96. On March 21, 2003, Trans Union initiated an investigation into the accuracy of the First USA Account by submitting an ACDV to First USA via the E-OSCAR system.

97. When Trans Union transmitted this ACDV, it indicated to First USA the nature of Plaintiff's dispute by conveying the following dispute code: "Special Comment, Compliance Condition and/or remarks message disputed".

98. First USA returned its ACDV to Trans Union and therein verified that Trans Union's reporting of the Account was accurate by checking the "Verified As Reported" box.

99. As with the Plaintiff's first dispute of the First USA Account, this dispute code was used because it is in the remarks that the deceased status was being reported.

100. In addition, Trans Union included the following narrative: "Consumer Is Not Deceased."

101. First USA then responded to Trans Union's ACDV by checking the box "Change Data As Shown" <u>without</u> making any attempt to change either the ECOA code or the Remarks Field. A copy of the third First USA ACDV is attached hereto and made a part hereof as <u>Exhibit H</u>.

102. First USA only attempted to change the balance owing, high credit, and closed date.

103. When a furnisher marks the "Change Data As Shown" box but and makes changes to some fields and not others, both Trans Union and furnishers understand that the response is interpreted as a verification of the information that is left unchanged.

104. Therefore, Trans Union's automated system could not remove the deceased status from the First USA Account.

105. On March 21, 2003, Trans Union initiated an investigation into the accuracy of the Chase Account by submitting an ACDV to Chase.

106. When Trans Union transmitted this ACDV, it indicated to Chase the nature of Plaintiff's dispute by conveying the following dispute code:  "Fraudlent Account".

107. Chase returned its ACDV to Trans Union and therein verified that Trans Union's reporting of the Account was accurate by checking the "Verified As Reported" box.

108. On April 2, 2003, Trans Union mailed Plaintiff the results of this reinvestigation, which also contained a Trans Union consumer disclosure dated April 2, 2003. A copy of the April 2, 2003 Investigation Results is attached hereto as Exhibit I.

I AFFIRM UNDER THE PENALTIES FOR PERJURY THAT THE FOREGOING REPRESENTATIONS ARE TRUE AND ACCURATE, TO THE BEST OF MY KNOWLEDGE AND BELIEF.

*Eileen Little*
Eileen Little, Group Manager
TRANS UNION, LLC

Dated: May 6, 2005