1          UNITED STATES DISTRICT COURT
                DISTRICT OF MINNESOTA
2         COURT FILE NO.:  03-3295 ADM/AJB
                     -   -   -
3

4    PEGGY MARIE SCHMITT,        :
                                 :
5          Plaintiff,            :
                                 :
6          - vs -                :
                                 :
7    CHASE MANHATTAN BANK NA,    :
     Et al,                      :
8                                :
           Defendants.           :
9    - - - - - - - - - - - -    :

10

11                   -  -  -  -  -

12         Wednesday, September 22, 2004

13                   -  -  -  -  -

14         TRANSCRIPT OF DEPOSITION OF SHIRLEY

15   HICKMAN, taken by and before Gina Pellecchia,

16   Professional Reporter and Notary Public, in

17   the Executive Suite Room of the Hilton

18   Philadelphia Airport, 4509 Island Avenue,

19   Philadelphia, Pennsylvania 19153, on the above

20   date, commencing at 2:10 p.m.

21

22

23

24

Exhibit C

Page 22

1  that they're disputing now before?
2      A.     Yes.
3      Q.     What is that?
4      A.     If the account has been disputed
5  using the same claim code, the system will
6  notify me.
7      Q.     And if a different claim code is
8  used, the system won't notify you, correct?
9      A.     Correct.
10     Q.     And there's only one claim code
11 for deceased; is that right?  We already
12 talked about that?
13     A.     Yes.
14     Q.     And that was B7?
15     A.     Yes.
16     Q.     All right.  What's A4?
17     A.     Joint liability, ex-spouse,
18 business.
19     Q.     So that wouldn't have anything to
20 do with deceased, correct?
21     A.     Correct.
22            MR. HICKMAN:  I'll object
23        to those last two questions.  Lack of
24        foundation.

Page 23

1  BY MR. LYONS:
2      Q.     Now, in Priority Processing, you
3  have the ability to lock a FIN number; is that
4  correct?
5      A.     Yes.
6      Q.     Have you ever locked a FIN number
7  before?
8      A.     Yes.
9      Q.     And what is the reason that you
10 would lock a FIN number?
11     A.     If the consumer is an attorney or
12 a consumer has an attorney writing to Trans
13 Union.
14     Q.     Why is that important?
15     A.     That's the procedure.
16     Q.     Do you understand it?
17     A.     I'm not sure.  You would have to
18 ask Eileen Little.
19     Q.     But you, yourself, don't
20 understand why you do that?
21     A.     Correct.
22     Q.     So the attorney writes a letter.
23 The consumer that's disputing it isn't an
24 attorney.  The FIN gets locked.  And then what

Page 24

1  happens?  Why does the FIN get locked?
2            MR. CENTO:  I'm going to
3        object to this line of questioning as
4        lacking in foundation.
5            THE WITNESS:  Again, you
6        would have to ask Eileen Little.
7  BY MR. LYONS:
8      Q.     So you don't know why it's done?
9  That's just procedure?
10     A.     Right.
11     Q.     When does the FIN get unlocked?
12     A.     If the consumer maintains
13 activity with us and that file remains active,
14 it does not get unlocked.
15     Q.     If a dispute is completed, does a
16 FIN get unlocked?
17     A.     No.
18     Q.     So, for example, I write a letter
19 on behalf of my client, Peggy Schmitt, saying
20 she's not deceased.  ACDV goes out to a
21 creditor, and a response comes back.  Does the
22 FIN get locked or unlocked?
23            MR. CENTO:  Objection.
24        Incomplete hypothetical.  Calls for

Page 25

1        speculation.  You can answer.
2            THE WITNESS:  It's locked
3        when we open up the file, when we
4        create the file.
5  BY MR. LYONS:
6      Q.     And it doesn't get unlocked
7  until -- that's the part I didn't understand.
8      A.     If the consumer doesn't have
9  activity with us within a certain period of
10 time, the file will archive.  The next time
11 they contact us, if it's not done, the
12 consumer just contacts us, we wouldn't know
13 that the thing was previously locked.
14     Q.     What's the effect of a FIN being
15 locked?
16     A.     The Priority Processing would
17 handle the dispute.
18     Q.     Does Trans Union's Priority
19 Processing Department ever place a call to a
20 consumer in investigating whether or not their
21 claim that they're not dead is valid?
22     A.     No.
23     Q.     Why?
24     A.     I don't know why.

26

1    Q.    Does that seem like a reasonable
2  thing to do to you personally?
3    A.    I don't know.  I mean, it's not
4  procedure to do that.
5    Q.    And I understand that.  You've
6  testified to that.  But you personally, do you
7  think that's a reasonable thing to do?
8    A.    No, I don't.
9    Q.    Why?
10   A.    Because how would I know that the
11 person I'm talking to is really the person
12 that wrote in?
13   Q.    But you treat it as though the
14 person that wrote in is really the person,
15 right?
16   A.    Yes.
17   Q.    So I'm confused.  That confuses
18 me.  You take the letter to be real, correct?
19   A.    Yes.
20   Q.    Trans Union believes that when
21 someone writes in and says they're not dead,
22 that they're not dead, correct?
23   A.    Right.
24   Q.    Okay.  But to pick up the phone

27

1  and call that same person, then they don't
2  believe it anymore?  Is that what you're
3  telling me?
4    A.    No.  You asked --
5          MR. CENTO:  Objection.
6    You're starting to get argumentative
7    with her.  This is beyond the scope of
8    anything this witness is here to
9    testify about.  Go ahead.
10         THE WITNESS:  You asked
11   me what I believed.
12 BY MR. LYONS:
13   Q.    Right.
14   A.    Not what Trans Union --
15   Q.    Right.
16   A.    So it has -- I'm not here to talk
17 about what I believe.
18   Q.    Actually you are here to talk
19 about what you believe.  You're not designated
20 as a witness other than in your own individual
21 capacity today, which is different probably
22 than the times that you've testified before.
23 But you are here today to talk about you.  So
24 I'd like to know why you think that.

28

1    A.    Why I think what?
2    Q.    Why you think that calling the
3  consumer when they're disputing that they're
4  not dead is unreasonable.
5          MR. LYONS:  It's asked
6    and answered.  You're just arguing
7    with her.  Go ahead.
8          THE WITNESS:  Because I
9    just do.
10 BY MR. LYONS:
11   Q.    Does that school of thought seem
12 inconsistent, how Trans Union treats disputes
13 about people that are claiming they're not
14 deceased, with your belief about whether or
15 not people are deceased?  Does that seem
16 inconsistent?
17   A.    No.
18   Q.    In Priority Processing, if a
19 consumer says that they're not deceased and
20 you send a CDV -- or an ACDV, do you receive
21 the response back from the -- you personally
22 receive the response back from the creditor?
23   A.    No.
24   Q.    Is that handled by another human

29

1  being in Priority Processing, or is that
2  handled by an automated system?
3    A.    Automated system.
4    Q.    Regardless, correct?
5    A.    Correct.
6    Q.    Do you know what the outcome of
7  the dispute is after you send the ACDV to the
8  furnisher?
9          MR. CENTO:  Objection.
10   Lack of foundation, calls for
11   speculation.  You can answer.
12         THE WITNESS:  No.
13 BY MR. LYONS:
14   Q.    I don't mean to mischaracterize
15 what you said before -- and you'll, I'm sure,
16 correct me if I do that -- but you said that
17 you initiate investigations; is that right?
18   A.    Yes.
19   Q.    Who completes them?
20   A.    The system.
21   Q.    No live human being?
22   A.    No.
23   Q.    Is there ever a case where you
24 are alerted -- you, in Priority Processing,

Page 34

1  so I make sure I understand it correctly.
2      Q.      On day one, the trade line is
3  being disputed for, let's say, 30 days late.
4      A.      Okay.
5      Q.      On day 15, the same trade line is
6  being disputed as "I'm not dead." What
7  happens?
8              MR. CENTO:  Same
9      objection.
10             THE WITNESS:  A second
11     investigation would be initiated into
12     the deceased.
13             MR. LYONS:  Let's go off
14     the record a minute.
15                 - - -
16             (Whereupon, a discussion was
17     held off the record.)
18                 - - -
19  BY MR. LYONS:
20     Q.      Can you take a look at deposition
21  exhibit number two?
22     A.      Yes.
23     Q.      That should be that March 10th
24  letter; is that right?

Page 35

1      A.      Yes.
2      Q.      Is that your handwriting down the
3  right-hand side?
4      A.      Yes.
5      Q.      Do you see where you put "OK" up
6  near the first bullet point on the right-hand
7  margin?
8      A.      Yes.
9      Q.      Do you know what you meant when
10  you put "OK" there?
11     A.      No.  I don't remember.
12     Q.      All right.  Ms. Hickman, just so
13  I'm clear, special comment compliance
14  condition and/or remarks message disputed is
15  coded as what?
16     A.      B7.
17     Q.      And if that dispute was twice
18  sent regarding the same account, same trade
19  line, you would be -- or the operator, Trans
20  Union operator, would be notified of that?
21             MR. CENTO:  Objection.
22     Lack of foundation, calls for
23     speculation, incomplete hypothetical.
24     You can answer.

Page 36

1  BY MR. LYONS:
2      Q.      Is that what you testified to?
3      A.      Yes.
4      Q.      Okay.  But even with that
5  notification, that doesn't set off any new
6  procedure, correct?
7              MR. CENTO:  Same
8      objection.
9              THE WITNESS:  Correct.
10  BY MR. LYONS:
11     Q.      It doesn't cause any additional
12  information to be sent to the furnisher,
13  correct?
14             MR. CENTO:  Same
15     objection.
16             THE WITNESS:  Correct.
17  BY MR. LYONS:
18     Q.      And it doesn't cause Trans Union
19  to conduct its investigation any differently?
20             MR. CENTO:  Same
21     objection.
22             THE WITNESS:  Correct.
23  BY MR. LYONS:
24     Q.      Do you have some kind of time

Page 37

1  limit in Priority Processing to handle
2  disputes, a certain amount in an hour?
3      A.      Yes.
4      Q.      What's that criteria?
5      A.      I believe it's ten disputes per
6  hour.
7      Q.      And therefore, roughly in that
8  six-minute time frame -- am I right about
9  that?  You have an hour, but that's not
10  including break time or anything else.  They
11  expect you to do ten in an hour?
12             MR. CENTO:  Objection.
13     Lack of foundation.
14  BY MR. LYONS:
15     Q.      Is that right?
16     A.      Yes.
17     Q.      So that's about six minutes per
18  dispute, correct?
19     A.      Correct.
20     Q.      And in those six minutes, you
21  have to read the dispute, process the dispute
22  in your own mind, correct, figure out what it
23  is?
24     A.      Correct.

Page 42

```
1     A.      Those words?
2     Q.      Words to that effect saying, "I'm
3  not dead. I'm really alive"?
4     A.      Yes.
5     Q.      How many times have you done that
6  before?
7     A.      I don't know.
8     Q.      Do you remember the specific
9  occasion when you did that?
10    A.      No.
11    Q.      But you know you've done it
12 before?
13    A.      Yes.
14    Q.      Do you know if you've done it on
15 more than one occasion?
16    A.      Yes.
17    Q.      On how many occasions do you
18 believe you've done it?
19    A.      I don't know.
20    Q.      More than five?
21    A.      Yes.
22    Q.      More than ten?
23    A.      Yes.
24    Q.      More than 25?
```

Page 43

```
1     A.      No.
2     Q.      More than -- okay. Not more than
3  25?
4     A.      No.
5     Q.      At that point when you're putting
6  on a dispute statement that says that the
7  person is not dead, does that trigger any
8  additional communication between Trans Union
9  and the furnisher of the deceased information?
10         MR. CENTO: Objection.
11       Vague, ambiguous, calls for
12       speculation, lack of foundation. You
13       can answer.
14         THE WITNESS: Can you
15       rephrase your question, please?
16         MR. LYONS: Court
17       reporter, can you read back that
18       question?
19         THE WITNESS: I know what
20       the question is. Can you rephrase it
21       for me?
22 BY MR. LYONS:
23    Q.      Sure. In the occasion where a
24 consumer has asked you to update their
```

Page 44

```
1  consumer statement to say "I'm not dead" or
2  words to that effect, does that trigger any
3  additional communication from your department
4  to the furnisher?
5         MR. CENTO: Same
6       objection.
7         THE WITNESS: No.
8  BY MR. LYONS:
9     Q.      I may have asked you this. This
10 is my last question. In Priority Processing,
11 you do or do not have occasion to contact via
12 the telephone the creditor?
13         MR. CENTO: Same
14       objection.
15         THE WITNESS: I do.
16 BY MR. LYONS:
17    Q.      And on what occasions do you
18 contact the creditor?
19    A.      For clarification.
20    Q.      Clarification related to what?
21    A.      The disputed information.
22    Q.      How would that get to your
23 attention that there was confusion?
24         MR. CENTO: Same
```

Page 45

```
1       objections. I'm going to enter a
2       continuing objection as to foundation,
3       incomplete hypotheticals, call for
4       speculation, are vague and ambiguous.
5       You can answer.
6         THE WITNESS: Can you say
7       the question again for me, please?
8         MR. LYONS: Can you read
9       it back?
10                - - -
11       (Whereupon, the court reporter
12       read back the last question.)
13                - - -
14         THE WITNESS: If I was
15       handling the file, and based on the
16       creditor's response, I needed
17       clarification.
18 BY MR. LYONS:
19    Q.      I guess I'm confused by that.
20 Under what circumstances is the creditor
21 responding directly to you?
22    A.      They're not.
23    Q.      Then how are you notified of it?
24    A.      If I have to respond in writing
```

Shirley Hickman

Page 46

1  to an agency, an outside party, then I would
2  have the information there in front of me.
3      Q.      An agency or an outside party,
4  what does that mean?
5      A.      If the consumer has filed a
6  complaint with the Attorney General, Better
7  Business Bureau, that's an outside agency.
8      Q.      In those circumstances then, does
9  it automatically come back to you?
10     A.      Does what?
11     Q.      Does the response from the
12  creditor automatically come back to you?
13     A.      No.
14     Q.      Then I'm confused.  And I'm
15  sorry.  There are occasions when the
16  creditor's response comes back to you.  That's
17  what you testified to, correct?
18     A.      I don't believe I ever said it
19  came back to me.
20     Q.      Well, how does it come to be that
21  you're telephoning the creditor?
22     A.      If the consumer has contacted an
23  outside agency and I have to respond in
24  writing back to that agency, I am reviewing

Page 47

1  the history.  If I need clarification from the
2  creditor, I can pick up the phone and call
3  them.
4      Q.      Okay.  What triggers you writing
5  a response back to this third party or back to
6  the agency?
7      A.      Because the consumer filed a
8  complaint with them.
9      Q.      But that would happen every time,
10  right, or not necessarily?
11     A.      (No response.)
12     Q.      Every time a consumer writes to
13  an Attorney General and the Attorney General
14  writes to Trans Union on the consumer's
15  behalf, are you required to write a response
16  back?
17     A.      Yes.
18     Q.      So in every one of those
19  situations, a request goes out to the
20  furnisher from Priority Processing
21  investigating, correct?
22     A.      Correct.
23     Q.      And if something comes back that
24  doesn't make sense to you or is inconsistent,

Page 48

1  you have the ability to make a telephone call,
2  correct?
3      A.      Correct.
4      Q.      And that's different -- or is it
5  different, I guess, is what I'm asking
6  you -- than when an attorney writes a letter
7  to Trans Union's Priority Processing
8  Department on behalf of the consumer?
9      A.      It is different.
10     Q.      Why?
11     A.      You would have to ask Eileen
12  Little.
13     Q.      Okay.  But there is a difference
14  in how that's handled, correct?
15     A.      Correct.
16          MR. LYONS:  Thank you.
17  That's all the questions I have.
18          MR. CENTO:  Anyone on the
19  phone have any questions?
20          MR. MENGHILLIS:  No
21  questions.
22          MR. SPRAIN:  CSC has no
23  questions.
24              -  -  -

Page 49

1          (Whereupon, the witness was
2  excused.)
3              -  -  -
4          (Whereupon, the deposition
5  concluded at 3:00 p.m.)
6              -  -  -

13 (Pages 46 to 49)

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF MINNESOTA
 2            COURT FILE NO.:03-3295 ADM/AJB

 3

 4   PEGGY MARIE SCHMITT,

 5        Plaintiff,

 6
          V
 7

 8   CHASE MANHATTAN BANK NA; SAKS INCORPORATED d/b/a
     HERBERGER'S; BANK ONE CORPORATION a/k/a FIRST
 9   USA BANK, N.A.; TRANS UNION, L.L.C.; EXPERIAN
     INFORMATION SOLUTIONS INC.; CSC CREDIT SERVICES, INC.;
10   EQUIFAX, INC. d/b/a EQUIFAX INFORMATION SERVICES INC.;
     CBC COMPANIES d/b/a CREDIT BUREAU OF SIOUX FALLS,
11   INC.; and FACTUAL DATA CORP.,

12        Defendants.

13

14

15              Oral deposition of EILEEN

16   LITTLE, taken at the offices of Trans

17   Union, L.L.C., 2 Baldwin Place, 1510

18   Chester Pike, Crum Lynne, Pennsylvania,

19   on Thursday, June 24, 2004, commencing

20   at approximately 9:33 a.m., before

21   Joanne Rose, a Registered Professional

22   Reporter and Notary Public, pursuant to

23   notice.

24
```

Page 50

1  consumer.  It's an ACDV report.
2  Q.   Like the number of ACDVs that were
3  sent to this subscriber?
4  A.   No.  I don't know what's on the
5  report.
6  Q.   Okay.  So are you familiar with
7  what the purpose of that number is?
8  A.   No.
9  Q.   But you believe it has to do with
10  a separate report?
11  A.   Yes.  It's nothing to do with this
12  consumer.
13  Q.   It has something to do with the
14  ACDV process?
15  A.   As I said, I don't know.
16  Q.   Okay.  Over to the right it says,
17  "Date: 1-11-03."  What does that mean?
18  A.   From looking at that and then
19  going back to the TU168, that's the date
20  we received this verification back.
21  Q.   Okay.  And the "Page: 1459," what
22  does that mean?
23  A.   That's probably -- I don't know
24  how -- I don't know.  That's a system

Page 51

1  question.  I really don't know that.
2  Q.   And if you wanted to know the
3  answer to that question, who would you
4  ask?
5  A.   Kim Bye.
6  Q.   And where does Kim work?
7  A.   In Crum Lynne.
8  Q.   In what division?
9  A.   She's the ACDV/CDV liaison.
10  Q.   Okay.  Does she work underneath
11  you or in a separate division
12  altogether?
13  A.   She reports to me.
14  Q.   And what are her job
15  responsibilities?
16  A.   She works between Trans Union and
17  the subscribers on ACDV/CDV problems.
18  She sets up their mailboxes, whatever.
19  She handles the subscribers.
20  Q.   What kind of problems does she
21  handle?
22  A.   If for some reason a creditor
23  can't get into their mailbox; I don't
24  know.  I mean, if they have questions on

Page 52

1  how to complete the ACDV/CDV, you know,
2  going from a paper environment to an
3  automated environment, how to switch
4  over, she would be able to help them
5  with that.
6  Q.   Okay.  Now, if you go down a
7  little bit more, you'll see on the left-
8  hand side it says, "Subscriber Response
9  Date: 1-10-03."  What does that mean?
10  A.   We're asking the creditor to
11  respond by that date.
12  Q.   By 1-10-03?
13  A.   Yes.
14  Q.   And then below that it says, "To
15  comply with F.C.R.A. a response is
16  required by 1-7-03."  What does that
17  mean?
18  A.   I think the F.C.R.A. states that
19  the creditor has five days to respond
20  once they get our notification.  That's
21  probably what generates that date.
22  Q.   So the F.C.R.A. requires them to
23  respond by 1-7 of '03 but Trans Union
24  says they need to respond by 1-10 of

Page 53

1  '03?
2  A.   That's what -- yeah.
3  Q.   If you look over to the right,
4  you'll see "Date Received: 12-26-02."
5  What does that mean?
6  A.   That's the date we received the
7  consumer's letter.
8  Q.   And the "Date Entered: 12-31-02,"
9  what does that mean?
10  A.   That's the date we process the
11  letter.
12  Q.   And what does process mean?
13  A.   Generated the CDV's verification,
14  opened the dispute.
15  Q.   And does that date jive with
16  what's contained in TU168?
17  A.   Yes, it does.
18  Q.   Where do you see 12-31 in
19  Deposition Exhibit Number 2 on page
20  TU168?
21  A.   Well, it says, "12-30-02."
22  Q.   Right.  That's a different date
23  than the date that appears on Exhibit 6;
24  correct?

Page 54

1   A.   Yeah.  But, if you let me finish,
2   once you print this, it will print the
3   next day.
4   Q.   Okay.
5   A.   So that's why it's 12-31.
6   Q.   So it always prints the next day?
7   A.   Right.
8   Q.   Now, back to this compliance with
9   F.C.R.A. and a response is required by
10  January 7th of '03.  Does the dispute operator
11  operator -- does the dispute operator
12  calculate that time or is that done
13  automatically?
14  A.   The system does that.
15  Q.   Now, on the left, down a little
16  ways it says, "consumer states
17  comments."  Do you see that?
18  A.   Yes.
19  Q.   And right above that is a phone
20  number.  Do you see that?
21  A.   Yes.
22  Q.   Did Trans Union have Peggy
23  Schmitt's phone number?
24  A.   That's what was on her credit

Page 55

1   report when we pulled it.
2   Q.   Okay.  And so if Trans Union
3   wanted to, they could have called Peggy
4   Schmitt; is that correct?  They had her
5   telephone information?
6   A.   If they felt there was a need,
7   they could have called her, yes.
8   Q.   So if they wanted to call and find
9   out if she was actually closing any time
10  in the near future on her mortgage
11  refinance that she had already told them
12  she couldn't get because she was being
13  reported as deceased, they had her
14  number to call her; is that correct?
15  A.   Is that her telephone number?
16  Q.   You tell me.  It's Trans Union's
17  data.
18  A.   But Trans Union didn't put it
19  there.  One of her creditors put it
20  there.  I mean, I don't know if that's
21  her correct telephone number.  I mean,
22  she didn't dispute it so I can only
23  assume that it is.
24  Q.   Okay.  So what you're telling me

Page 56

1   is that information is received from
2   creditors; right?
3   A.   Yes.
4   Q.   And that information is correct;
5   right?
6   A.   I don't know.  Is it correct?  I
7   don't know what her telephone number is.
8   Q.   Maybe I'm misunderstanding.  The
9   information that you get from creditors
10  is assumed to be accurate; isn't that
11  true?
12  A.   That's correct.
13  Q.   Okay.  So, as far as you know, as
14  far as Trans Union knows, that number is
15  correct for Peggy Schmitt?
16  A.   Well, that's what I said.  I'd
17  have to assume that's correct, yes.
18  Q.   Okay.  Now, below that telephone
19  number is the "consumer states
20  comments."  And what does that mean?
21  A.   That's the information we're
22  giving to First USA as to why the
23  consumer is disputing this account.
24  Q.   So is this where there gets to be

Page 57

1   some kind of a coding of what the
2   dispute is?
3   A.   Yes.
4   Q.   Okay.  Before I thought you said
5   that there wasn't any coding of the
6   dispute but that's not accurate, is it?
7   There is coding of what her dispute was?
8       MR. CENTO:  Objection;
9   mischaracterizes the witness's prior
10  testimony.  You can answer.
11      THE WITNESS:  Correct.  See,
12  you're talking about two different
13  things.  The claim code is a code that
14  would go into the system and generate
15  that text back to the subscriber.
16  BY MR. LYONS:
17  Q.   And that's right where it says
18  "consumer states"; right?  That's where
19  a code is entered?
20  A.   Yes.
21  Q.   And that's a numeric code;
22  correct?
23  A.   Well, it's alpha and numeric.
24  Q.   And do you know what the

Page 58

1  alphanumeric code is that would generate
2  "special comment, compliance condition
3  and/or remarks message disputed"?
4  A.  I don't know all of them.  I
5  believe it's A4.
6  Q.  A4?  "A" as in apple?
7  A.  Yes.
8  Q.  Now, is there a code, alphanumeric
9  code, or any other kind of code for
10  consumer claims they're not deceased?
11  A.  No.
12  Q.  But you've seen that dispute
13  before, have you not?
14  A.  Consumer not deceased?
15  Q.  Yeah.  Peggy Schmitt wasn't the
16  first time you had ever seen somebody
17  complain about being reported deceased
18  by Trans Union; right?
19  A.  Correct.
20  Q.  Now, does Trans Union send to, in
21  this case, First USA Bank a copy of
22  Deposition Exhibit 3, Ms. Schmitt's
23  dispute letter?
24  A.  No, we do not.

Page 59

1  Q.  And why is that?
2  A.  We don't need to based on how
3  we're handling -- putting in the
4  comments.  We're telling them what she's
5  disputing.  They don't need to see this
6  letter.  I mean, the letter doesn't
7  state anything different than what we're
8  telling them.
9  Q.  But it doesn't say anything about
10  the fact that she says that there's been
11  no verification of a death certificate
12  and it doesn't show that she believes
13  she's being mistaken for another woman.
14  Do you see that on Deposition Exhibit
15  Number 3?
16  A.  Right.
17  Q.  And it doesn't say anything about
18  the fact that she's being unable to
19  refinance for a mortgage, does it?
20  A.  No.
21  Q.  So is it standard operating
22  procedure for Trans Union not to send
23  the consumer's letters to the furnishers
24  in the ACDV process?

Page 60

1  A.  Yes, it is.
2  Q.  And the reason for that is why?
3       MR. CENTO:  Objection; asked
4  and answered.
5       THE WITNESS:  I don't believe
6  there's a need for that.  I mean, I
7  don't think the creditor knowing that
8  information is going to do anything
9  different.  They have to go back and
10  provide us with the information.  It's
11  not going to change their response
12  because they know she is unable to
13  obtain refinancing.
14  BY MR. LYONS:
15  Q.  Does Trans Union indicate to the
16  furnisher when it's handled by priority
17  processing that it is being handled by
18  priority processing as opposed to the
19  dispute operators?
20  A.  No.
21  Q.  Why?
22  A.  It doesn't matter what type of
23  dispute it is.  They have to respond
24  with the information.

Page 61

1  Q.  But don't you think the furnisher
2  would want to know that the dispute was
3  from a lawyer or from the Attorney
4  General or someone else?
5  A.  No.  I think they have an
6  obligation to respond with the accurate
7  information.  It doesn't matter who sent
8  the dispute in.
9  Q.  Well, Trans Union treats the
10  dispute differently if it comes from
11  those sources that I just mentioned;
12  right?
13  A.  As a courtesy to the consumer,
14  yes, we do.
15  Q.  Okay.  And don't you think that
16  maybe the furnisher would like to
17  provide the consumer the same courtesy
18  that Trans Union is allegedly providing
19  them?
20  A.  But is it going to change their
21  answer?  Is it going to change their
22  response?
23  Q.  I don't know.  Is it going to
24  change the way Trans Union handles it?

Page 62

1   A.   No.
2   Q.   Okay.  So you believe that the
3   "consumer states comments" accurately
4   reflected that Peggy Schmitt was
5   claiming she wasn't dead?
6   A.   Yes.  We also have another message
7   saying "Consumer message:  not
8   deceased."
9   Q.   And that appears down in the
10  middle of the page; is that correct?
11  A.   Correct.
12  Q.   Now, is that something that Trans
13  Union fills in?
14  A.   Yes, it is.
15  Q.   All right.  And what's that field
16  for?
17  A.   Generating additional dispute
18  information.
19  Q.   So that's providing a little bit
20  more information than what was provided
21  up in the code information up above; is
22  that correct?
23  A.   Correct.
24  Q.   And is that discretionary, whether

Page 63

1   or not the operator fills in the
2   consumer message?
3   A.   Yes.
4   Q.   Okay.  And is there any type of
5   instruction or requirement that on a
6   deceased dispute that that information
7   is filled in?
8   A.   I don't believe so, no.
9   Q.   Now, what investigation did Trans
10  Union undertake in December of 2002 in
11  response to Ms. Schmitt's dispute in
12  Deposition Exhibit Number 3?
13  A.   We sent the verification forms to
14  First USA and Saks.
15  Q.   And other than those actions of
16  filling out these forms and
17  electronically sending them to the two
18  furnishers, did Trans Union perform any
19  other investigation?
20  A.   No.
21  Q.   Did they call the Social Security
22  Administration?
23  A.   No.
24  Q.   Did they go to any free Internet

Page 64

1   source that would have information about
2   consumers being deceased?
3   A.   No.
4   Q.   Are you aware of any free Internet
5   web site that provides information about
6   persons being deceased?
7   A.   No, I'm not.
8   Q.   Did Trans Union in any way attempt
9   to contact Peggy Schmitt to find out
10  more information about why she believes
11  she wasn't dead?
12        MR. CENTO:  Objection; asked
13  and answered.  Go ahead.
14        THE WITNESS:  No, we did not.
15  BY MR. LYONS:
16  Q.   And that is standard operating
17  procedure, not to call the consumer and
18  find out whether or not they're
19  deceased; correct?
20        MR. CENTO:  Same objection.
21        THE WITNESS:  Well, if she
22  sent us a letter, we know she's not
23  deceased.
24  BY MR. LYONS:

Page 65

1   Q.   Okay.  And does Trans Union
2   believe she's not deceased?
3   A.   Yes.
4   Q.   So Trans Union didn't require any
5   additional proof from Peggy Schmitt that
6   she was not dead; correct?
7   A.   Correct.
8   Q.   All right.  Now, the process with
9   regard to the ACDV, specifically with
10  Deposition Exhibit Number 6, is this is
11  going to be sent out to First USA Bank
12  electronically; correct?
13  A.   Correct.
14  Q.   And then some electronic response
15  is going to come back; correct?
16  A.   Correct.
17  Q.   All right.  But it's my
18  understanding -- and I think you
19  testified to it before but just so the
20  record is clear, let's make sure we're
21  both on the same page.  When that
22  information comes back from First USA
23  Bank, nobody from Trans Union is going
24  to look at it; is that correct?

Eileen Little

Page 66

1   A.   That's correct.
2   Q.   It's going to go automatically
3   into the system?
4   A.   Correct.
5   Q.   So if First USA puts or responds
6   in such a way that doesn't make any
7   sense to Trans Union, how is Trans Union
8   going to be able to stop that
9   information from going back on Peggy
10  Schmitt's report?
11       MR. CENTO:   Objection; vague;
12  ambiguous.
13       THE WITNESS:   Well, if it's
14  something that's illogical, then the
15  system won't accept it.  That ACDV will
16  fail and then an operator will have to
17  look at it.
18  BY MR. LYONS:
19  Q.   Okay.  And even at the dispute
20  operator level?
21  A.   Yes.
22  Q.   So in this case, if it came back
23  with information that Peggy Schmitt, the
24  same Peggy Schmitt that you just

Page 67

1   testified that Trans Union believed was
2   alive, if it came back deceased, would
3   the system catch that?
4   A.   Can you say that again?
5   Q.   Sure.  Would the system catch --
6   you've just testified that you
7   understood that Peggy Schmitt was alive.
8   A.   Correct.
9   Q.   Okay?  If First USA Bank replies
10  to this ACDV and verifies that Peggy
11  Schmitt is dead, does the system
12  automatically catch that?
13       MR. CENTO:   Objection;
14  incomplete hypothetical.  Go ahead.
15       THE WITNESS:   Well, they're
16  not saying that she's dead.  They're
17  saying that someone associated with the
18  account.  The account history states
19  that it has a deceased status.  They're
20  only reporting the status of the
21  account, not the consumer.
22  BY MR. LYONS:
23  Q.   Okay.  I think I lost you on
24  that.  Hold on one second.  If we go

Page 68

1   back to Deposition Exhibit Number 4 and
2   we look at what, for example, Saks or,
3   for that matter, First USA Bank
4   reported, it doesn't say anything about
5   the account being reported as deceased.
6   It actually says, "consumer deceased";
7   right?
8   A.   Well, it's part of the account
9   history.
10  Q.   Yeah, but it doesn't say as part
11  of the account history.  It just says,
12  "consumer deceased."  Do you see that?
13  A.   Yes.
14  Q.   And that field where it says
15  "consumer deceased," what's that field
16  that it's in right there?
17  A.   The comment field.
18  Q.   The "special comment" field?
19  A.   Right.
20  Q.   Where is the ECOA field?
21  A.   It doesn't show on that report but
22  they're not reporting an ECOA.  What
23  they're reporting is an X in the ECOA
24  field.

Page 69

1   Q.   Which would normally indicate
2   whether or not this is an individual
3   account, a joint account, an authorized
4   user, etc.; correct?
5   A.   Correct.
6   Q.   So how does Trans Union know
7   whether or not the consumer deceased
8   information is related to Peggy Schmitt
9   or somebody else?
10  A.   I don't know that.  All I know is
11  that it's referencing that account
12  number, that account, not that consumer.
13  Q.   But Trans Union is putting this
14  information on Peggy Schmitt's Trans
15  Union file, isn't it?
16  A.   Because that's the way the
17  creditor is reporting it, yes.
18  Q.   Yeah.  But the creditor doesn't
19  tell Trans Union how to report
20  information.  Trans Union controls its
21  own file, doesn't it?
22  A.   But they're reporting this account
23  history.  What they're reporting is the
24  account history, and the deceased

18 (Pages 66 to 69)

Eileen Little

Page 70

1 comment is part of the account history.
2 Q.   But does Trans Union's system
3 catch -- I can't remember what the word
4 was that you used.  What happens if
5 there's inconsistencies?  Does the
6 system fail?  No.  The ACDV fails; is
7 that right?
8 A.   Correct.
9 Q.   The ACDV fails if there's
10 inconsistent information; correct?
11 A.   Correct.
12 Q.   Would you agree with me that if
13 First USA Bank reports back that this
14 account is being reported as deceased
15 regarding Peggy Marie Schmitt, that
16 that's got to be inconsistent with what
17 Trans Union already recognized as being
18 truthful?
19 A.   No; because they have the account
20 history.
21 Q.   Right.  But Trans Union has the
22 letter and has the belief that Peggy
23 Marie Schmitt is alive; right?  We
24 already went through that.

Page 71

1 A.   Right.
2 Q.   Okay.  So if Trans Union thinks
3 she's alive --
4       MR. CENTO:  Let her answer.
5 Let her answer.
6       MR. LYONS:  Oh, okay.  I'm
7 sorry.  I didn't realize she wasn't
8 done.
9       THE WITNESS:  But this
10 account information is owned by First
11 USA Bank.  They're reporting their
12 account history.
13       MR. CENTO:  I want to enter
14 an objection.  This is slightly beyond
15 the scope.  We're getting beyond the
16 scope of the designations.  She is not
17 an expert on ACDV processing.  She can
18 testify about how this ACDV was
19 processed, but she is not the person
20 most knowledgeable about every aspect of
21 ACDV processing.
22       MR. LYONS:  Okay.  And that
23 would be --
24 BY MR. LYONS:

Page 72

1 Q.   Ms. Little, should I talk to Kim
2 Bye about that?
3 A.   I would, yes.
4 Q.   If you wanted to answer these
5 questions, you'd feel better if you had
6 Kim Bye next to you to answer those
7 questions; is that correct?
8 A.   Correct.
9 Q.   Okay.  Well, you see what my point
10 is, is that if Trans Union believes that
11 she's alive and an ACDV comes back
12 saying that the account that she's
13 associated with is reporting her as
14 deceased, that should give somebody or
15 something at Trans Union pause to say,
16 well, wait a minute, that's not what we
17 have; right?
18 A.   No, I don't believe that.
19 Q.   You don't think that's reasonable?
20 A.   No.
21 Q.   Well, why do you not believe
22 that's reasonable?
23 A.   Because I don't know the history
24 of the account.

Page 73

1 Q.   Okay.  What kind of history of
2 account would Trans Union -- would you
3 like to know?
4 A.   I'd want to know who else was on
5 the account and why is First USA
6 reporting it as deceased.  I mean, they
7 must have a record or death certificate
8 or something of the second party on this
9 account as being deceased.
10 Q.   Okay.  If, in fact, there was a
11 second party; right?  I mean, you don't
12 even know whether or not this was a
13 joint account or if this was always an
14 individual account; right?
15 A.   Correct.
16 Q.   But Trans Union maintains records
17 concerning that; right?  Because that's
18 what the archives or snapshots are;
19 right?
20 A.   Correct.
21 Q.   So somebody in consumer relations
22 and certainly the dispute operator could
23 go and look up this information that you
24 are talking about right now?

Page 74

1  A.  No, they could not.
2  Q.  Why is that?
3  A.  Because they don't have access to
4  snapshots.  We have to go through our
5  corporate office to get that.
6  Q.  Okay.
7  A.  So it's not a tool that the
8  operators can use.
9  Q.  Okay.  Does priority processing
10 have access to that?
11 A.  They can only order it upon our
12 attorney's request.
13 Q.  But priority processing can do
14 that; correct?
15 A.  Correct; but not at their
16 discretion.  It has to be a direction
17 from one of our attorneys.
18 Q.  But if they bring it up, if
19 priority processing recognizes it and
20 asks for that, there's a process for
21 that to be responded to, I'm assuming?
22 A.  Yes.
23 Q.  Okay.
24     MR. RAWLIN:  Tom?

Page 75

1      MR. LYONS:  Yes.
2      MR. RAWLIN:  This is Dustin.
3  We've been going for about an hour and
4  20 minutes.  Can we take a five-minute
5  break?  I don't want to interrupt you if
6  you're in a line of questioning.
7      MR. CENTO:  Actually, I need
8  a break, too.
9      MR. LYONS:  Okay.  Let's all
10 take a break.  Let's come back in five
11 minutes.
12     MR. CENTO:  All right.
13     (A break was taken from
14 10:42 a.m. to 10:52 a.m.)
15 BY MR. LYONS:
16 Q.  Ms. Little, in looking at
17 Deposition Exhibit Number 6, can you
18 tell how or in what manner First USA
19 Bank responded to Trans Union's ACDV?
20 A.  Yes.
21 Q.  And how did they respond to it?
22 A.  They requested that we change the
23 balance from 1500 to 338 and also to
24 change the ECOA to an "I."

Page 76

1  Q.  From what?
2  A.  "X."
3  Q.  And "X" is the deceased code; is
4  that right?
5  A.  Correct.
6  Q.  And "I" means what?
7  A.  Individual.
8  Q.  So this would mean that the
9  account was an individual account
10 related only to Peggy Schmitt; correct?
11 A.  Correct.
12 Q.  So it wasn't a joint account
13 apparently?
14 A.  Not at this time, no.
15 Q.  And then below the consumer
16 message that we looked at before it
17 says, "authorized phone number and
18 name."  Do you see that?
19 A.  Yes.
20 Q.  And that's the agent and the
21 telephone number for the First USA Bank
22 representative that completed the ACDV
23 on their side.  Is that your
24 understanding?

Page 77

1  A.  Yes.
2  Q.  And that information is given in
3  case Trans Union needs to call them; is
4  that right?
5  A.  Well, it's an information field
6  that if we ever had to go back, we would
7  have a name as to who authorized those
8  changes.
9  Q.  Okay.  So it's not necessarily for
10 further investigation.  It's to go back
11 and find out who did it?
12 A.  Yes.
13 Q.  Now, the response code that was
14 entered by Bank of America or by First
15 USA Bank was 02; is that right?
16 A.  Yes.
17 Q.  And that means modify account
18 information as indicated, as it appears
19 on Exhibit 6?
20 A.  Yes.
21 Q.  The information that was also
22 looked to be changed was "MIN10."  What
23 does that mean, if you know?
24 A.  It's the terms of the account,

Page 78

1   minimum payment $10.
2   Q.   Okay.  And that was changed from
3   minimum payment of $31?
4   A.   Yes.
5   Q.   Now, down below the dotted line,
6   the second dotted line, is some other
7   information.  What fields are these?
8   A.   These are fields that state what
9   information was reported back by the
10  creditor.
11  Q.   Okay.  So the top line shows what
12  was sent?
13  A.   Right.
14  Q.   And the bottom line shows what was
15  received?
16  A.   Right.
17  Q.   Okay.  So the "sent" line is sent
18  by whom?
19  A.   It's what Trans Union is sending
20  them.
21  Q.   And then the bottom line is what's
22  received back from the furnisher?
23  A.   Yes.
24  Q.   So "account status 11," what does

Page 79

1   that mean?
2   A.   It's how the account was being
3   reported at the time when we generated
4   the CDV or ACDV.
5   Q.   And what's the "11" stand for?
6   A.   I don't know off the top of my
7   head.
8   Q.   Is that some kind of a code?
9   A.   Yes, it is.
10  Q.   All right.  And the "MOP 01," what
11  does that mean?
12  A.   That's the manner of payment.
13  Q.   That's whether they're paying on
14  time or late or charged off or something
15  like that?
16  A.   Correct.
17  Q.   And that's from 01 to 09?
18  A.   Yes.
19  Q.   09 being the worst?
20  A.   Yes.
21  Q.   The "remarks" code then, that
22  field says "DEC."  Does that stand for
23  deceased?
24  A.   Yes, it does.

Page 80

1   Q.   So Trans Union was sending
2   information on the sent line to First
3   USA Bank and then the information they
4   received back was on the line below;
5   correct?
6   A.   Yes.
7   Q.   So in the "received" under
8   "account status" there's no information
9   received back; is that correct?
10  A.   Correct.
11  Q.   What does that mean?
12  A.   Nothing.  I mean, it's blank.
13  Q.   What's the significance, I guess,
14  is what I'm asking you.
15  A.   None.
16  Q.   So does that mean it doesn't
17  change or it stays the same?
18  A.   Right.  They're not changing
19  anything as far as the account status.
20  Q.   Okay.  And then when we get down
21  to the MOP code, that didn't change;
22  correct?
23  A.   Correct.
24  Q.   And the "remarks" code on the

Page 81

1   deceased didn't change; is that right?
2   A.   Correct.
3   Q.   So they changed the ECOA code but
4   they didn't change the "remarks" code?
5   A.   Exactly.
6   Q.   And which code is superior or
7   which code drives the consumer deceased
8   indicator?
9   A.   The ECOA code drives the comments,
10  but they're independent of each other as
11  well.
12  Q.   All right.  So let me just make
13  sure I understand that.  The ECOA code
14  that we see in the top above the dotted
15  line, above the first dotted line drives
16  the "DEC-deceased" special comment; is
17  that right?
18  A.   Correct.
19  Q.   And then below where we see
20  "change data as shown," when they mark
21  it as an "I," when First USA Bank marks
22  it as an "I," then there wouldn't be
23  that "DEC-deceased" code; correct?
24  A.   No, that's not correct.

Page 82

1   Q.   All right.  That's where I'm
2   getting confused.  Can you help me out?
3   A.   Well, they didn't indicate to
4   change that field.
5   Q.   So the "I" in and of itself under
6   ECOA doesn't automatically delete that
7   "deceased" special comment?
8   A.   That's correct.
9   Q.   Okay.  So in order to delete that
10  "special comment," that has to be done,
11  what, manually by them?
12  A.   They have to overlay it with
13  another comment.
14  Q.   What kind of comment?
15  A.   Closed, a generic comment for that
16  field.
17  Q.   So they have to enter something
18  into that field or else the deceased is
19  going to come back on?
20  A.   Yes.
21  Q.   Now, your counsel may object to
22  this question and, if he does, then I'll
23  stand by, but are you qualified to talk
24  about why the system wouldn't catch that

Page 83

1   what appears to be contradictory
2   information?
3         MR. CENTO:  You have my
4   objection.  That's beyond the scope of
5   her knowledge.
6         MR. LYONS:  And, Counsel, who
7   would better be able to address that
8   question?
9         MR. CENTO:  (No response.)
10        MR. LYONS:  Is it
11  Ms. Romanowski or is it Mr. Stockdale?
12        MR. CENTO:  You know, it
13  might be Stockdale.  It also might be
14  someone like a Kim Bye.
15        MR. LYONS:  Okay.  Fair
16  enough.
17  BY MR. LYONS:
18  Q.   Ms. Little, is it your testimony
19  that as a result of the ECOA indicator
20  changing from "X" to "I," that First USA
21  Bank was reporting this as an individual
22  account as opposed to a deceased
23  account; is that correct?
24  A.   Correct.

Page 84

1   Q.   But because they didn't fill in
2   the "special comment" code or field with
3   something, anything, the deceased got
4   put back on there.  Is that your
5   testimony?
6   A.   At what time did it get put back
7   on there?
8   Q.   Right now, right as we're looking
9   at this thing right here on Exhibit 6.
10  Because there was nothing placed in that
11  "special comment" field, then the
12  deceased indicator went back on the --
13  A.   Yes.
14  Q.   -- report?
15  A.   Yes.
16  Q.   Now, do you believe that's the
17  fault of First USA Bank?
18  A.   Well, yes.  They didn't
19  override -- they didn't tell us what to
20  put in that field.
21  Q.   But you do recognize that First
22  USA Bank had attempted to change the
23  indicator from deceased to alive?  Do
24  you recognize that, Ms. Little?

Page 85

1         MR. CENTO:  Objection; vague;
2   ambiguous.
3         THE WITNESS:  Yes.  I mean,
4   they changed the ECOA.
5   BY MR. LYONS:
6   Q.   Is it fair to say, Ms. Little,
7   that there was conflicting information
8   reported by First USA Bank back to Trans
9   Union in response to this ACDV?
10  A.   Yes.  They didn't give us what we
11  needed.  We needed something in the
12  deceased comment, in that comment field.
13  Q.   And would this be something --
14  what you just stated that Trans Union
15  needed, if this were handled with a CDV
16  as opposed to an ACDV -- and let me
17  preface that by saying it's my
18  understanding that the CDV process
19  actually is returned -- there's a form
20  that's returned to a live Trans Union
21  operator, a human being, that then would
22  have to code the information back in.
23  Am I right about that?
24  A.   Yes.

Page 86

1    Q.    If this were a CDV, would this
2    information or the inconsistency or the
3    conflicting information that we see in
4    Deposition Exhibit Number 6, would that
5    give rise to a Trans Union operator
6    reacting in some form or would they just
7    go ahead and process it just the way it
8    was?
9         MR. CENTO:  Objection; vague;
10   calls for speculation; incomplete
11   hypothetical.  You can answer.
12        THE WITNESS:  I can't state
13   what someone else would do if they were
14   looking at it.
15   BY MR. LYONS:
16   Q.    Okay.  And that's a fair
17   statement.  So let me back you up one
18   more step.  What's the procedure at
19   Trans Union in a CDV for the same
20   situation?
21        MR. CENTO:  Same objection.
22        THE WITNESS:  I don't know
23   that there is a set procedure but if
24   they had any questions or concerns about

Page 87

1    it, again, they could bring it to their
2    team leader.  The team leader can do
3    something.  They could always go to Kim
4    Bye and ask her for instructions.  I
5    mean, I don't know what the operator
6    would do.
7    BY MR. LYONS:
8    Q.    So there's no set procedure for
9    handling when a furnisher provides
10   conflicting or incomplete information;
11   is that correct?
12   A.    They're supposed to key in what's
13   reported back from the subscriber.
14   Q.    Even if it's inconsistent?
15   A.    Well, they don't know that it's
16   inconsistent because in here that's
17   exactly what the operator did.  She went
18   in and changed the "X" to an "I" and
19   updated all the fields that they
20   requested.  But the deceased comment
21   would not change because there was
22   nothing put in that field.
23   Q.    Right.  So it showed -- instead of
24   that the person was deceased, it was

Page 88

1    changed to not deceased but the special
2    comment code still said deceased; right?
3    A.    Well, it was never changed because
4    the change didn't happen because when
5    they changed it to an "I," the fact that
6    those comments were on there changed it
7    back to an "X."
8    Q.    Okay.  Now that's the part that I
9    missed.  I'm sorry.  I didn't hear you
10   say that.  So it never got put back to
11   an "I"?
12   A.    Not at this time, no.
13   Q.    Because the special comments drive
14   the ECOA code?  I'm confused.  Because I
15   thought it was the other way around.
16   A.    It is the other way around.
17   Q.    Then how did that happen?
18   A.    Because you have to change both.
19        MR. CENTO:  I'm going to
20   object and she really is too far down
21   this line.  If you want to go farther
22   down this line, we're going to have to
23   bring in on a different day somebody
24   like Kim Bye.

Page 89

1         MR. LYONS:  Okay.  But, I
2    mean, she apparently knows something
3    that I don't know, and I'd like to find
4    out what she does know.  She says that
5    the "X" was originally changed to an "I"
6    and then changed back to an "X."
7    BY MR. LYONS:
8    Q.    Is that what you're saying,
9    Ms. Little?
10        MR. CENTO:  Right.  And she's
11   told you what's happened.  But if you
12   want a further explanation on why that
13   happens, we need someone other than her
14   or someone more knowledgeable in that
15   area.
16        MR. LYONS:  Let me just
17   finish up this line of questioning with
18   her.
19   BY MR. LYONS:
20   Q.    Ms. Little, do you know why that
21   happened?
22        MR. CENTO:  I'm going to
23   instruct her not to answer.  I will
24   provide another 30(b)(6) witness on that

23 (Pages 86 to 89)

Page 90

1  subject.
2  MR. LYONS: But, Counsel, you
3  can at least let her answer the question
4  of whether or not she knows. Why can't
5  she answer whether or not she knows?
6  MR. CENTO: She is not the
7  person most qualified to answer that
8  question. I don't know what she knows
9  on that area, but I do know that there's
10  another witness who should be giving
11  that testimony and that's the witness
12  I'll provide for you.
13  MR. LYONS: Are you afraid to
14  let her testify?
15  MR. CENTO: No. She's not
16  prepared to testify. She doesn't know
17  enough to testify in that area.
18  MR. LYONS: Okay. Let's mark
19  Deposition Exhibit Number 7 as BO00001.
20  (Deposition Exhibit 7 was
21  marked for identification purposes.)
22  MR. CENTO: Okay.
23  BY MR. LYONS:
24  Q. Ms. Little, have you ever seen

Page 91

1  this document that we've marked as
2  Deposition Exhibit 7 before?
3  A. No.
4  Q. Do you know what it is?
5  A. It's an ACDV or AUDV.
6  Q. And isn't it just another form of
7  Deposition Exhibit Number 6?
8  A. Yes.
9  Q. And do you recognize the
10  information appearing on Deposition
11  Exhibit 7 to be the same or similar to
12  the information contained in Deposition
13  Exhibit Number 6?
14  A. Yes.
15  Q. Now, if we can turn back for a
16  minute to Exhibit Number 2, where is
17  the -- on what page, on what Trans Union
18  page is the system information related
19  to the investigation results of Exhibit
20  6?
21  A. TU170.
22  Q. All right. And on TU170 this is a
23  Trace Set Detail for this specific ACDV;
24  correct?

Page 92

1  A. Correct.
2  Q. And there in the original field is
3  the "X" appearing on the right-hand side
4  of the page; is that correct?
5  A. Correct.
6  Q. And then below that, the
7  correction part of the page shows the
8  "I"; is that correct?
9  A. Correct.
10  Q. All right. And what was the
11  outcome or the result of Trans Union's
12  investigation then? Does it show on
13  this page, on TU170?
14  A. I'm not sure I understand what you
15  mean by the outcome.
16  Q. Well, Trans Union performed an
17  investigation, correct, into
18  Ms. Schmitt's dispute?
19  A. Right.
20  Q. That she was not dead and Trans
21  Union's investigation result was what?
22  A. We contacted the two creditors and
23  then sent her a corrected copy or the
24  revised copy after the investigation was

Page 93

1  completed.
2  Q. Okay. And I guess what I'm trying
3  to find out is let's break it down into
4  two investigations. Let's talk first
5  about the First USA Bank investigation.
6  What was Trans Union's conclusion
7  concerning the First USA Bank
8  investigation?
9  A. First USA was updated, the balance
10  was updated, and then the Saks was
11  deleted or changed.
12  Q. Let's not talk about Saks for a
13  minute. Let's just stick with First
14  USA. So the Trans Union investigation
15  results regarding First USA Bank were to
16  update the balance; is that your
17  testimony?
18  A. Yes.
19  Q. And you'd agree with me,
20  Ms. Little, that didn't have anything to
21  do with Ms. Schmitt's dispute, did it?
22  A. No.
23  Q. Would you agree with me that
24  investigation conclusion or result was

Page 94

1  non-responsive to her dispute?
2  A.  Well, the information that she was
3  disputing didn't change, no.
4  Q.  Okay.  Does Trans Union have the
5  ability to mark a trade line as consumer
6  disputes?
7  A.  There's a field we can put that
8  statement in, yes.
9  Q.  Okay.  And nobody put that
10  statement in related to the First USA
11  Bank trade line, did they?
12  A.  No.
13  Q.  Why was that?
14  A.  I mean, the consumer didn't
15  request it.
16  Q.  I beg your pardon?
17  A.  The consumer didn't request that
18  be done and she didn't ask for a
19  consumer statement.
20  Q.  Okay.  Let's back up for one
21  second, just so we're all on the same
22  page.  When a consumer disputes, that
23  field can actually be put in by Trans
24  Union right into the trade line; is that

Page 95

1  correct?
2  A.  Right.  It goes into what we call
3  the collateral field.  There's space in
4  there to put consumer disputes or --
5  Q.  Can we look back at Deposition
6  Exhibit Number 4 for a minute?  And if
7  we look down at TU003, let's just focus
8  on the First USA Bank trade line?
9  A.  Right.
10  Q.  Where is that field, the
11  collateral field?
12  A.  Right.  Where is that on Exhibit
13  4?
14  Q.  Yeah.  Where would it be in
15  relationship to the First USA Bank trade
16  line?  Where is that collateral field?
17  A.  I believe it would be between the
18  "opened" date as well as the "status."
19  Q.  So it can fit right in there?
20  A.  Right.
21  Q.  Now, are you telling me that in
22  order for Trans Union to put consumer
23  disputes in that trade line, in that
24  field, that something additional to what

Page 96

1  she had already sent in her December
2  20th letter would have to be provided to
3  Trans Union?
4  A.  No.  What I stated was that she
5  did not ask for a consumer statement to
6  be put on.  You're asking me why it
7  wasn't done.  I don't know.  I'm not the
8  operator here.  I didn't do this.
9  Q.  And, Ms. Little, I'm not trying to
10  upset you.  I want to know what the
11  procedure is related to putting
12  disputes, consumer disputes, in the
13  specific trade line field.
14  A.  It's not normally our policy to do
15  that.
16  Q.  Why is that?
17  A.  I don't know why.
18  Q.  Okay.  Is that policy about
19  whether or not to do that for the
20  consumer located anywhere in Deposition
21  Exhibit Number 5?
22  A.  Is there a policy as to why we
23  don't do it?  Is that what you're asking
24  me?

Page 97

1  Q.  Well, let's start with that
2  question.  Is there a policy or a
3  procedure manual dedicated to why Trans
4  Union doesn't do it?
5  A.  Not that I'm aware of, no.
6  Q.  Is there a policy or procedure
7  manual and specifically anywhere in
8  Exhibit Number 5 is there information
9  about whether or not it should be done
10  or when it should be done?
11  A.  I don't know.  I don't know that.
12  Q.  If you wanted to find out about
13  that, who would you need to talk to?
14  A.  I'd have to go through this manual
15  page by page to find out if there's
16  anything in writing.
17  Q.  Okay.  But just without paging
18  through the manual, based on your
19  multiple years, multiple decades of
20  experience at Trans Union, you don't
21  know of any policy or procedure related
22  to that?
23  A.  I don't know.
24  Q.  Okay.  Now, in addition to

Page 102

1  Q.   Does Trans Union put information
2  into a consumer statement that the
3  consumer doesn't request?
4  A.   Add her own verbiage to it, no.
5  Q.   Well, if I call up and I say, "I
6  think I'm a victim of fraud," does Trans
7  Union put in all this other information
8  about "Do not extend credit without
9  first contacting me personally and
10  verifying all applicant information"?
11  A.   Right.  It's a protective
12  statement.
13  Q.   Right.  But that's not necessarily
14  the verbiage that the consumer used;
15  correct?
16  A.   I mean, I don't know what the
17  consumer -- just because he's stating it
18  was fraud, this is what we do to protect
19  him.
20  Q.   I understand that.  But what I'm
21  asking you is does Trans Union put in
22  information that's pre-formatted
23  regarding consumer statements?
24  A.   Yes.  We have a standard statement

Page 103

1  regarding fraud.
2  Q.   Okay.  So regardless of what the
3  consumer says, there's a standard form
4  that can be put in and added by Trans
5  Union?
6  A.   If the consumer had wanted
7  different information on there, we would
8  enter that as well.
9  Q.   And are there any restrictions to
10  the information that Trans Union places
11  on consumer statements?
12  A.   As far as the verbiage?
13  Q.   Yeah.
14  A.   I mean, we're not going to allow
15  anyone to use curses or whatever in the
16  system.
17  Q.   And why is that?
18  A.   Because it's our database and it's
19  unprofessional.
20  Q.   Even if they're really, really mad
21  about some information that's not right?
22  A.   Well, the verbiage doesn't really
23  express the tone of how mad they are.
24  It's our --

Page 104

1  Q.   What about how insistent they are,
2  like, for example, if they're not dead?
3  I mean, have you ever put in a consumer
4  statement consumer states they're not
5  dead and they're really, really, really,
6  really, really not dead?
7  A.   I'm sure it's been done.
8  Q.   Okay.  But it wasn't done in this
9  case?
10  A.   No, it wasn't.
11        MR. LYONS:  Let's mark
12  Deposition Exhibit Number 8 as TU0009.
13        (Deposition Exhibit 8 was
14  marked for identification purposes.)
15        MR. CENTO:  Okay.
16  BY MR. LYONS:
17  Q.   I'm showing you what's been marked
18  as Deposition Exhibit Number 8.  Can you
19  identify this document for me?
20  A.   This again is an ACDV that was
21  sent in reference to the Saks dispute.
22  Q.   All right.  So it's still in
23  reference to the dispute of Exhibit 3
24  but it's a different furnisher; correct?

Page 105

1  A.   Correct.
2  Q.   And this furnisher was also
3  reporting Ms. Schmitt as deceased; is
4  that correct?
5  A.   Correct.
6  Q.   Now, the subscriber response date
7  on this one January 7th of '03.  Do you
8  see that?
9  A.   Yes.
10  Q.   And Trans Union was telling
11  Herberger's that to comply with the
12  F.C.R.A. a response is required by 1-6?
13  A.   Correct.
14  Q.   Do you know what the policy is if
15  they respond later than the date that's
16  required in the bottom field?  Will they
17  still take the response?
18  A.   As long as it's not past the 28th
19  day of the date the dispute was opened.
20  Q.   Okay.  And the 28th day after this
21  dispute was opened would be what?
22  A.   I don't know.  I mean, I don't
23  have a calendar in front of me.
24  Q.   But that is how it's calculated?

Page 106

1  A.  Right.
2  Q.  And do the operators know that or
3  does the system know that or how does
4  everyone know that that's what the real
5  date is?
6  A.  The system generates all that.
7  Q.  Okay. To the right of the control
8  number is "MA/SM: 0924." What does that
9  mean?
10  A.  It's the market/sub market of the
11  report, of the credit report.
12  Q.  And that's for marketing
13  purposes? That doesn't have anything to
14  do with investigation of the dispute,
15  does it?
16  A.  Not for investigation. Well, it
17  would -- that market area is handled by
18  location 3, Crum Lynne. So on the
19  bottom of her credit report it would
20  tell her to dispute this and mail your
21  information to this address.
22  Q.  And refer her back to Crum Lynne?
23  A.  Right.
24  Q.  Now, the dispute related to

Page 107

1  this -- if you could get out Exhibit 6
2  again and hold it next to Exhibit 8, it
3  looks like there's a different "consumer
4  states comments." Would you agree with
5  that?
6  A.  Right.
7  Q.  This one says, "Subscriber
8  comment/remarks message disputed" and
9  then right below it it says "not
10  deceased." Do you see that?
11  A.  Yes.
12  Q.  Why, do you know, was there a
13  different "consumer states comment"
14  listed?
15  A.  They had to use a different claim
16  code.
17  Q.  And why was that?
18  A.  I don't know why.
19  Q.  And is that typical procedure?
20  A.  I mean, I can't answer what claim
21  code she used. I mean, it covers the
22  dispute. She still put in there "not
23  dispute."(sic) The creditor knew
24  exactly what we were looking for.

Page 108

1  Q.  And how do you know that?
2  A.  Because they responded.
3  Q.  But you haven't talked to anyone
4  from Herberger's, right?
5  A.  Correct.
6  Q.  But do you know the code, the
7  alphanumeric code, that would produce
8  this "consumer states comment"?
9  A.  No.
10  Q.  And how did Herberger's respond to
11  Trans Union's ACDV?
12  A.  They gave a narrative response.
13  Do you see where it says, "999 free-form
14  response" and then they reported "no
15  record of Peggy being deceased."
16  Q.  And did they change the ECOA? It
17  was previously an "X."
18  A.  On my copy it just looks like
19  there's a little asterisk or a dot
20  there.
21  Q.  I mean, up in the Trans Union
22  portion. Was there previously an "X"?
23  A.  Yes.
24  Q.  All right. So previously

Page 109

1  Herberger's was reporting her as
2  deceased. Is that your understanding?
3  A.  Yes.
4  Q.  And then they decided to change
5  that reporting; correct?
6  A.  Yes.
7  Q.  Now, does Trans Union do any
8  investigation as to why they were
9  originally reporting Peggy as deceased?
10  A.  No.
11  Q.  Does Trans Union consider that
12  change in the reporting of an individual
13  dead for a certain period of time and
14  then re-reporting that person as
15  alive -- does that make that furnisher
16  unreliable?
17  A.  I'm not sure I understand your
18  question.
19  Q.  Well, it looked like Herberger's
20  was reporting Peggy Schmitt as being
21  deceased for some period of time.
22  A.  Right.
23  Q.  And then all of a sudden, when you
24  asked them, hey, she says she's not

Page 110

1  deceased, they say, oh, my gosh, you're
2  right; she's not deceased.  Does that
3  raise any flags about their reliability
4  in reporting to Trans Union?
5  A.   No, not that I'm aware of.
6  Q.   On my copy of Exhibit 8 there's
7  just a little asterisk below the "X."
8  And are you saying you don't know what
9  that means?
10  A.   That's what I said it looks like
11  to me, too, just an asterisk.
12  Q.   Okay.  Do you know what that
13  asterisk means?
14  A.   No.
15  Q.   Is that a recognized code or
16  indicator for an ECOA field?
17  A.   No, it's not.
18  Q.   Looking back at Exhibit Number 2,
19  if we go to TU172, how does the system
20  treat the information that was received
21  back from Herberger's?
22  A.   Well, this was not an automated
23  request.  This failed because the
24  subscriber put in that "999 free-form

Page 111

1  response."  So an operator generated
2  this or made this correction.
3  Q.   Okay.
4  A.   So what she went in and did was
5  she entered that they verified the name,
6  address, social, previous address, and
7  they changed the "X" to an "I."
8  Q.   Based on what?
9  A.   Probably that asterisk.  I mean, I
10  don't know.
11  Q.   Now, when you say this was handled
12  manually, was it handled manually
13  because the system considered it a
14  failure on the ACDV?
15  A.   Yes.
16  Q.   And where does it say that in
17  Exhibit 2 or how do you know that, I
18  should say?
19  A.   When you look at TU172 where it
20  says "VR operator," it gives you an
21  operator ID.
22  Q.   Okay.
23  A.   So that tells me that an operator
24  did it.

Page 112

1  Q.   As opposed to if we go back a
2  page, or two pages, to TU170, it says
3  "VR operator ID" what?
4  A.   "CRS9REQ3," which is an automated
5  process.
6  Q.   All right.  Thank you.  So is it
7  fair to say, Ms. Little, that you don't
8  know why the operator changed the ECOA
9  code from "X" to "I"?
10  A.   No.  I can only assume, you know,
11  maybe she seen that asterisk and assumed
12  that field was being changed.  Based on
13  their narrative response that there's no
14  record of her being deceased, they
15  changed it to an "I."
16      MR. LYONS:  Let's mark as
17  Deposition Exhibit Number 9 TU0010.
18      MR. CENTO:  You want the
19  whole thing or just that page?
20      MR. LYONS:  Oh, no.  Through
21  0015.  Thanks.
22      (Deposition Exhibit 9 was
23  marked for identification purposes.)
24      MR. CENTO:  Okay.

Page 113

1  BY MR. LYONS:
2  Q.   Ms. Little, I'm showing you what's
3  been marked as Deposition Exhibit Number
4  9.  Can you identify this document for
5  me?
6  A.   This is the revised copy after our
7  investigation that went back to the
8  consumer.
9  Q.   And Exhibit 9 shows that the Saks
10  account had been updated to take off the
11  deceased; correct?
12  A.   Correct.
13  Q.   But that the First USA Bank trade
14  line still was being reported as
15  deceased?
16  A.   Correct.
17  Q.   And there was no indication in the
18  collateral field that the consumer
19  disputed that information; correct?
20  A.   Correct.
21  Q.   If you could turn back to page 173
22  of Exhibit 2.
23  A.   Yes.
24  Q.   What information is contained on

Page 114

1 this page concerning or which dispute is
2 this concerning?
3 A. (Witness reviews exhibit.)
4 Q. Ms. Little, do you know?
5 A. No. I'm looking at it but there's
6 no -- here's an account number. I got
7 it. So that's in reference to the Saks
8 account.
9 Q. Okay. Thank you.
10 A. And you had asked me before about
11 what claim code was generated regarding
12 this one. It's B7.
13 Q. That appears on the top of TU173?
14 A. Yes.
15 Q. Thank you. Now, before Exhibit 9
16 gets sent back to or is generated to
17 Peggy Schmitt, does anyone from Trans
18 Union review it?
19 A. No.
20 Q. And this is a report dated January
21 11, 2003?
22 A. Yes.
23 Q. If you flip to TU0014, which is
24 part of Exhibit Number 9, there's a

Page 115

1 field at the bottom of the page called
2 "special messages." Do you see that?
3 A. Yes.
4 Q. What is that section of the report
5 used for?
6 A. They're messages that the system
7 would generate.
8 Q. And are they information for Trans
9 Union's purposes or are they information
10 for Peggy Schmitt's purposes?
11 A. They're information for
12 subscribers as well as Peggy Schmitt's
13 information.
14 Q. So it's for subscribers and for
15 Peggy Schmitt?
16 A. Yes.
17 Q. Not for Trans Union?
18 A. Well, no, because we're not
19 looking at them. We're generating them.
20 Q. And have you ever known it to be
21 the case that in the "special message"
22 field there would be any information
23 about inconsistency or contradictory
24 information concerning reporting

Page 116

1 consumer is deceased?
2 A. No, I've never seen it.
3 Q. Have you ever seen a special
4 message concerning a consumer disputing
5 being reported as deceased in the
6 "special message" field?
7 A. Can you say that again?
8 Q. I sure can. Have you ever seen
9 any phrase or verbiage that the consumer
10 disputes being deceased in the "special
11 message" field?
12 A. No.
13 Q. All right. Now, if you look at
14 Deposition Exhibit Number 2, Ms. Little,
15 does this tell you when is the next time
16 that Ms. Schmitt disputes any
17 information on her Trans Union credit
18 report?
19 A. Yes.
20 Q. When is that?
21 A. It's transaction 004 and it's
22 March 12, '03.
23 Q. All right.
24 MR. LYONS: Let's mark as

Page 117

1 Deposition Exhibit Number 10 TU0016
2 through 0018.
3 (Deposition Exhibit 10 was
4 marked for identification.)
5 MR. CENTO: Okay.
6 BY MR. LYONS:
7 Q. Ms. Little, I'm showing you what's
8 been marked as Deposition Exhibit Number
9 10. Is this the correspondence that
10 generated the notation in Deposition
11 Exhibit Number 2 related to the second
12 dispute of Peggy Schmitt?
13 A. Yes, it is.
14 Q. All right. And what page does the
15 second dispute information begin on?
16 A. On TU168.
17 Q. All right. And was this dispute
18 handled by priority processing?
19 A. Yes, it was.
20 Q. And that would have been a
21 different operator; is that correct?
22 A. Yes.
23 Q. Now, in looking at TU168, am I
24 right that the operator for the first

Page 134

1  Do you see that?
2  A.  Yes.
3  Q.  But there's no "X" next to that
4  field, is there?
5  A.  No, there's not.
6  Q.  But, despite that, it appears as
7  though data was changed by or attempted
8  to be changed by First USA Bank.  Do you
9  see that?
10  A.  I see that they have a March of
11  '03 verification date and that's it.
12  Q.  You don't see over on the right-
13  hand side where they tried to change the
14  ECOA code from "X" to "I"?
15  A.  I see that but I don't know
16  that -- I mean, they're not indicating
17  to us to change that.  So I don't know
18  that they're requesting us to change it.
19  Q.  Okay.  Let me back up just a
20  second.  Are you testifying that the
21  information that's contained below the
22  dotted line is information that was
23  inputted by some entity other than First
24  USA Bank?

Page 135

1  A.  No, I'm not.  First USA Bank
2  entered that information in there.
3  Q.  And what you're testifying to
4  today is that you believe that that was
5  information that First USA didn't want
6  to change or they did want to change?
7  A.  I don't know what First USA Bank
8  wanted.  I mean, they put "verified as
9  reported" and that's what we're going to
10  act on, those instructions.
11  Q.  So if they changed data in that
12  field where it says "change data as
13  shown," Trans Union will ignore those
14  data changes?
15  A.  Right.  You can't ask -- you can't
16  state that it's "verified as reported"
17  and then ask for a change.
18  Q.  That seems inconsistent, doesn't
19  it?
20  A.  Right.
21  Q.  But is that the kind of
22  inconsistency that would kick this ACDV
23  and cause it to fail?
24  A.  No.  It wouldn't fail because

Page 136

1  there's something in that "verified as
2  reported" box.  That's what they're
3  going to go with, "verified as
4  reported."
5  Q.  Despite the fact that there is
6  data that apparently First USA Bank
7  wants to change?
8  A.  Right.  And their response code is
9  01 and that also states that the account
10  information is verified as accurate.
11  Q.  Now, was this handled by the
12  system or was this handled by a live
13  operator?  If I could direct your
14  attention to TU174.
15  A.  This was an automated response.
16  Q.  But this one was handled by
17  priority processing; is that correct?
18  A.  The dispute was, not the
19  reverification.
20  Q.  Right.  In order for priority
21  processing to handle the response, there
22  would have had to have been a lock
23  placed on the FIN; is that right?
24  A.  Right.  Then it would go back to

Page 137

1  that operator telling her that her
2  dispute is closed.
3  Q.  Okay.  But there was no lock
4  placed on the FIN; correct?
5  A.  The FIN is locked now.  I don't
6  know.  I mean, it was an attorney file
7  so they would have locked it back then,
8  yes.  It probably was locked.
9  Q.  It was locked at the time that
10  this dispute was processed?
11  A.  Yes.
12  Q.  And that would result in some
13  report being generated back to the
14  operator by the system?
15  A.  Yes.  As I said, but they don't
16  use that report for the way you think
17  they're using that report.  I mean, all
18  that report is telling them is that the
19  dispute is closed and in order to
20  complete it and generate the corrected
21  copy; that's what that report is for.
22  Q.  Why is that report in place?  What
23  purpose does it serve?
24  A.  It notifies them when a dispute

Page 150

1  A.   There's about a staff of maybe 15
2  to 20 in the department, but they all
3  don't have the same responsibility.
4  There could be some that just handle
5  attorney disputes and then there's some
6  that handle Better Business, Attorney
7  General complaints.  So I would say that
8  there's probably seven that could handle
9  the Attorney General stuff.  There's
10 probably nine that handles attorney
11 disputes.
12 Q.   And out of those nine, you're not
13 aware of any policy at Trans Union to
14 handle specifically Consumer Justice
15 Center disputes or disputes from our law
16 office, are you?
17 A.   Not at all.
18 Q.   All right.  Can you make out for
19 me on Exhibit 16 the information that is
20 handwritten on the right-hand side next
21 to the paragraphs?  It looks like some
22 check marks and then I'm trying to see
23 if you can decipher that writing.
24 A.   The first one looks like it's

Page 151

1  "okay."  I don't know what -- under the
2  second paragraph what that is.
3  Q.   I couldn't tell it either and I
4  didn't know if you knew.  All right.
5       Now, in response to this
6  dispute marked as Exhibit 16, Trans
7  Union initiated additional investigation
8  with First USA Bank; is that correct?
9  A.   Yes.
10      MR. LYONS:  And I'd like to
11 mark as Deposition Exhibit Number 17
12 TU0030.
13      (Deposition Exhibit 17 was
14 marked for identification purposes.)
15 BY MR. LYONS:
16 Q.   Do you have it, Ms. Little?
17 A.   Yes.
18 Q.   Okay.  Thank you.  I'm showing you
19 what's been marked as Deposition Exhibit
20 Number 17.  Can you identify this for
21 me?
22 A.   This is the ACDV that was sent to
23 First USA on March 22nd, '03.
24 Q.   Does the operator that's

Page 152

1  investigating on behalf of Trans Union,
2  in addition to looking at the History
3  Search Summary, also look back through
4  the Trade Set or expanded Trade Set
5  Details concerning the previous
6  disputes?
7  A.   I mean, they have access to all
8  that information.  It's not required
9  that they go back and look through that.
10 Q.   Do you agree with me that that
11 might be helpful, that that information
12 contained in those notes that we've
13 marked as Exhibit 2 might be helpful in
14 assisting a priority processing operator
15 in investigating a dispute of a
16 consumer's?
17 A.   No; because we automated the
18 system for the system to do that in
19 place of the operator.  If it's
20 something that was previously
21 investigated before, then the system
22 knows that.
23 Q.   And what does the system do if
24 it's been investigated before?  What

Page 153

1  does the system do?
2  A.   If it's the same dispute, like,
3  say, an ownership dispute, it will
4  generate a letter back to the consumer
5  stating that this information has been
6  previously investigated.
7  Q.   And that it's frivolous; right?
8  A.   Yes.  And unless they could give
9  us additional information, it's not
10 going to be reinvestigated.
11 Q.   Exhibit 17 is the second dispute
12 concerning First USA Bank Number 8870 or
13 account number ending in 8870.  Is that
14 correct?
15 A.   Yes.
16 Q.   And did you show whether or not
17 one of those frivolous letters was
18 kicked out by the system?
19 A.   There was a letter on March 21st.
20 Let me see if it's in this Exhibit 2.
21      MR. CENTO:  Apparently it's
22 not in these documents.  I believe --
23 what's the date of the letter?
24      THE WITNESS:  March 21st.

Page 158

1  Q.   And that we see on Deposition
2  Exhibit Number 6?
3  A.   Yes.
4  Q.   Okay.
5  A.   Then the First USA, TU174 -- no,
6  I'm sorry -- TU175 is A3, a different
7  claim code.  So it wouldn't generate
8  that letter.
9  Q.   Let's stop right there for one
10 second because I already have a question
11 for you.  If we look at TU175, A3 says
12 "belongs to another individual."  And
13 that's not what came out on Exhibit 17.
14 A.   No.  It's for Exhibit 14.
15 Q.   Okay.  Then we should skip ahead
16 to TU179?
17 A.   Okay.  And that was A3 as well.
18 Q.   But that can't be because that
19 doesn't match up with TU0030.  Those are
20 different codes and different
21 information.  Actually, why don't you
22 turn to TU183.  I think that will help
23 you out.
24 A.   Okay.  And that's B7.

Page 159

1  Q.   The same as the one before;
2  correct?
3  A.   Right.
4  Q.   So the two disputes were identical
5  in that they were both coded as B7 but
6  yet the frivolous letter wasn't
7  generated.  And I want to know why that
8  was, if you know.
9  A.   The frivolous letter only would be
10 generated if it's disputed again within
11 a certain period of time.  Ownership I
12 think is 120 days and account
13 information is 58 days.
14 Q.   All right.  So because this was
15 outside that window --
16 A.   Then the letter wouldn't be
17 generated.  It would just be
18 investigated again.
19 Q.   Okay.  Now, does anybody -- does
20 Trans Union tell that to any of the
21 consumers that are disputing, that if
22 they redispute in a certain amount of
23 time, they're going to get a frivolous
24 letter unless they provide more

Page 160

1  information?
2  A.   No; other than the letter.
3  Q.   But I'm talking about before they
4  get the letter, is there anything, any
5  information that's provided to a
6  consumer that would warn them that in
7  order to redispute within a certain
8  amount of days, you're going to need to
9  provide us with more information?
10 A.   No.
11 Q.   So now this second dispute
12 concerning being dead related to this
13 trade line 8870, what happened this
14 time?  How did First USA Bank respond
15 this time?
16 A.   All right.  So we're looking at
17 Exhibit 17; right?
18 Q.   That's correct.
19 A.   They requested "change data as
20 shown" and they changed the balance, the
21 high credit, the date closed and the
22 verification date.
23 Q.   So this time around they failed to
24 change the ECOA code; correct?

Page 161

1  A.   Correct.
2  Q.   And, as a result of that, the
3  account remained reported as deceased;
4  correct?
5  A.   I believe so.
6       MR. CENTO:  She is looking at
7  TU0033, that disclosure.
8       MR. LYONS:  All right.  We're
9  going to mark that in a minute.
10      THE WITNESS:  It stayed with
11 the deceased comment.
12      MR. CENTO:  Do you want me to
13 mark that?
14      MR. LYONS:  Sure.  Let's mark
15 that.  We'll call that 18.
16      MR. CENTO:  Yes.
17      (Deposition Exhibit 18 was
18 marked for identification purposes.)
19 BY MR. LYONS:
20 Q.   Ms. Little, I'm showing you what's
21 been marked as Deposition Exhibit 18.
22 Can you identify this document for me?
23 A.   This is the notification back to
24 the consumer with the results of our

Page 162

1 investigation.
2 Q. And the investigation results were
3 that the account, the First USA Bank
4 account ending in 8870, was going to
5 remain on Ms. Schmitt's Trans Union
6 credit report as deceased; correct?
7 A. Yes.
8 Q. Now, on this disclosure it doesn't
9 seem like there's room for there to be
10 the consumer disputes verbiage in the
11 field that we were talking about before.
12 A. Okay. But I said I think it would
13 go in between those two lines. I'm not
14 sure where it would print out on this
15 report.
16 Q. Okay. I mean, I just didn't --
17 this was different than the one we
18 looked at before where there looked like
19 there was room. Do you know why this is
20 different?
21 A. There's probably more information
22 reported on that trade line.
23 Q. And Trans Union doesn't appear to
24 have added anything to her consumer

Page 163

1 statement about the fact that she's now
2 disputed this twice; correct?
3 A. Correct.
4 Q. And that's for what reason? Why
5 didn't Trans Union do that?
6 A. She didn't request that we change
7 or modify her consumer statement.
8 Q. Do you think that she wanted to
9 continue to be reported as deceased by
10 Trans Union?
11 A. I'm not going to answer as to what
12 she thought.
13 Q. Pardon me?
14 A. I'm not going to answer as to what
15 she thought.
16 Q. You don't know what she was
17 thinking?
18 A. No, I don't know what she was
19 thinking.
20 Q. Do you think she liked being
21 reported as deceased to other people?
22 MR. CENTO: Objection. I
23 will instruct her not to answer. It's
24 beyond the scope of this deposition.

Page 164

1 It's beyond the scope of the
2 designations. It's an improper question
3 and I'll enter another 26(c) objection.
4 Don't answer that.
5 BY MR. LYONS:
6 Q. Ms. Little, do you understand that
7 when Trans Union reports someone that is
8 not deceased as being deceased, that
9 that's harmful to their credit profile?
10 MR. CENTO: Object to the
11 form. You can answer if you know.
12 THE WITNESS: I mean, it
13 would depend on what the creditor -- how
14 the creditor viewed it.
15 BY MR. LYONS:
16 Q. I don't understand what you mean.
17 A. You're asking me if that
18 information is harmful.
19 Q. Yes.
20 A. Well, I'm not in a position to
21 grant or approve credit. That would be
22 up to the creditor who pulled the report
23 and they're viewing it and making that
24 decision. Did they view it as negative?

Page 165

1 Q. Do you have any understanding or
2 knowledge as to whether or not credit
3 reports or credit scores can be
4 generated where there is information on
5 a credit report like Trans Union showing
6 that a consumer is deceased?
7 MR. CENTO: I'm going to
8 object. It's beyond the scope of the
9 designations and instruct her not to
10 answer.
11 MR. LYONS: So even if she
12 knows, you're not going to let her
13 answer?
14 MR. CENTO: You haven't asked
15 anything about credit scoring and I
16 think is it this case or another case
17 that you've taken the deposition of
18 FICO?
19 MR. LYONS: It hasn't been in
20 this case.
21 MR. CENTO: Okay. Well --
22 MR. LYONS: Does that matter
23 as to whether or not you'll let her
24 answer?

42 (Pages 162 to 165)

Page 170

1  inaccurate information from appearing on
2  Ms. Schmitt's Trans Union credit report?
3      MR. CENTO:  Objection; vague;
4  ambiguous; overly broad.  Go ahead.
5      THE WITNESS:  I mean, that's
6  a program question for someone else.  I
7  can't answer that.
8  BY MR. LYONS:
9  Q.  You know of no way in which that
10  inaccurate information can be prevented
11  from appearing on her Trans Union credit
12  report?
13  A.  Right.  I don't know that.
14  Q.  Do you believe that it's
15  reasonable for Trans Union to continue
16  to report Ms. Schmitt as deceased when
17  they believe that she's not deceased but
18  First USA Bank is verifying information
19  saying she's deceased?
20      MR. CENTO:  Objection.  It's
21  beyond the scope of this witness's
22  knowledge.  It's beyond the scope of the
23  designations.  It contradicts the
24  witness's prior testimony.  I'm going to

Page 171

1  instruct her not to answer.
2  BY MR. LYONS:
3  Q.  Ms. Little, do you believe that
4  the Trans Union operator investigating
5  this March, 2003, dispute by Ms. Schmitt
6  that she was not dead followed Trans
7  Union procedure in investigating the
8  dispute?
9  A.  Yes.
10  Q.  And do you know specifically all
11  the steps that the Trans Union operator
12  took in investigating Ms. Schmitt's
13  second dispute claiming she wasn't dead?
14  A.  Yes.  They again regenerated the
15  verification form back to the
16  subscriber.
17  Q.  And that was the limit of the
18  investigation, was it not?
19  A.  Yes, it is.
20  Q.  Do Trans Union operators that are
21  investigating disputes through ACDV ever
22  have an opportunity to review whether or
23  not the furnisher or responder to the
24  ACDV has replied in a manner that is

Page 172

1  consistent with Trans Union's belief
2  about the investigation?
3      MR. CENTO:  Objection; vague,
4  ambiguous, asked and answered.
5      THE WITNESS:  No.
6      MR. LYONS:  Can we mark as
7  Deposition Exhibit Number 18 BO00003.
8      MR. CENTO:  We already have
9  18.
10      MR. LYONS:  That's 18?
11      MR. CENTO:  Yeah.  I mean,
12  wait a minute.  Hold on.  Is that 18?
13      MR. LYONS:  No.  18 is the
14  corrected report.  19 will be BO00003 I
15  think.
16      MR. CENTO:  I've got two
17  pages left, 0031 and 0032.
18      MR. LYONS:  You should have
19  003, which is a BO document.
20      MR. CENTO:  Yeah, okay.  I
21  got it.
22      MR. LYONS:  Let's mark that
23  as 19 I think is the right number.
24      (Deposition Exhibit 19 was

Page 173

1  marked for identification purposes.)
2  BY MR. LYONS:
3  Q.  Ms. Little, can you identify
4  Exhibit 19 for me?
5  A.  Again, it's a copy of the ACDV
6  that was generated 3-22-03 and it's
7  addressed to First USA Bank.
8  Q.  And do you believe that it is
9  similar in form to Deposition Exhibit
10  Number 17?
11  A.  Yes.
12      MR. LYONS:  If we could mark
13  TU0031 as Deposition Number 20.
14      (Deposition Exhibit 20 was
15  marked for identification purposes.)
16  BY MR. LYONS:
17  Q.  I'm showing you what's been marked
18  as Exhibit Number 20.  Can you identify
19  this document for me?
20  A.  Again, this is a screen print of
21  the ACDV that was sent to First USA.
22  It's the results of that 3-22-03.
23  Q.  This dispute concerned an account
24  that Ms. Schmitt was disputing as

HISTORY SEARCH SUMMARY

KKHSO010   072

SEARCH
FIN: 15763185 SSN:

COMMENT: **Y**

LAST:

ARCHIVE: N (Y/N)

NAME: SCHMITT          PEGGY          MARIE
ADDR: 3107    NE ULYSSES          ST
      MINNEAPOLIS          MN  55418
SSN: 482 94 9755  AGE/DOB: 1063  SPOUSE/SSN:

GROUP-CMD:

| CMD | TRAN-TYPE | I-D | CONTROL-NUM | DATE-REC | ST | ST-DATE | PR | Z52 | LOC | OPER |
|---|---|---|---|---|---|---|---|---|---|---|
| | RM-010 | | 15763185-012 | 04/10/03 | CL | 04/10/03 | | 03 | C5082 | |
| | CC-DSC | | 15763185-011 | | CL | 04/02/03 | PR | 03 | C5063 | |
| | LTRUNI | | 15763185-010 | 03/19/03 | CL | 03/21/03 | PR | 03 | C5063 | |
| | DSP | A | 15763185-009 | 03/19/03 | CM | 04/02/03 | PR | 03 | C5063 | |
| | I-DSC | A | 15763185-008 | 03/19/03 | CL | 03/21/03 | | 52 | 03 | C5063 |
| | CC-DSC | | 15763185-007 | | CL | 03/21/03 | PR | 03 | C5063 | |
| | LTRUNI | | 15763185-006 | 03/12/03 | CL | 03/13/03 | PR | 03 | C5063 | |

**MORE**

EXT-CODE:    SUB-CODE:    KEY:
1=CPT    3=ADD 4=CMT 5=BCK 6=FWD 7=PRV 8=NXT 9=FRC 10=SRH 11=CFD 12=ESC
**504I FIN IS LOCKED.**



**TU 167**

```
JISP/CORR                          TRADE SET DETAIL                    KKHSO520 006
CNTL: 15763185 002 03                                                      CR: 01A
CONSUMER: SCHMITT              PEGGY          MARIE
RESPONSE: C  FAVORABLE: F  STATUS: CM  DATE-REC: 12/26/02  DEL: N   MM/SS:
* COMPLETE DISPUTE *   ** CHANGED **                                  PRIORITY: 3
    S-CD    SUBS-NAME        DT-OP  HI-CR   DT-VER BAL-0    P-DUE   PMT PATTERN  E
ACCOUNT-NUMBER             L-TP  CR-LM   DT-CLS MD-DT---AMT---MOP           A-TP
COLLATERAL                     REMARKS TERMS                  HIST STATUS  MOP
ORIG:                     SUPP:              PRO
B  1B68010 FIRST USA BK   11/95 00005211 12/02 00001572 00000000 111111111111 X
4266869998378870          CC 00017000                            111111111111 R
                          DEC    MIN31                            048 00 00 00   01


CORR:
B  1B68010 FIRST USA BK   11/95 00001573 01/03 00000338 00000000 111111111111 I
4266869998378870          CC 00017000                            111111111111 R
                          DEC    MIN10                            *** ** ** **   01


VR OPID: CRS9REQ3 QC OPID:                                          EXPD:
DAVE: 1 2 3 5 DOB/02


NEXT-CODE:     SUB-CODE:      KEY:
1=CPT  2=RTN                                                        12=ESC
```

TU 170

```
LOC. 03                              TRANS UNION CORPORATION                    DATE: 01/11/03  TIME: 06:07
RPT-ID: KKAVB500-1                     CONSUMER RELATIONS                                        PAGE: 1459
                                 ACDV3 RESPONSES THAT WERE AUTO UPDATED


        EPT: N
        ER RESPONSE DATE: 01/10/03                      CONTROL: 115763185 002 03      MA/SM: 0103  SUB LOC: 001
TO COMPLY WITH F.C.R.A., A RESPONSE IS REQUIRED BY: 01/07/03   DATE ENTERED: 12/31/02   DATE RECD: 12/26/02

                                            VERF    SUBSCRIBER CHANGES TO CONSUMER DEMOGRAPHIC DATA:
NAME: SCHMITT, PEGGY MARIE                     (S) NAME:
  AKA:                                              AKA:
ADDR: 3107 NE ULYSSES ST                       (S) ADDR:
      MINNEAPOLIS, MN 55418
PREV: 3522 S 37TH AV                           (S) PREV:
      MINNEAPOLIS, MN 55406

SSN: 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                               (S) SSN:
DOB: 10/01/63                                  (S) DOB:
PHONE: 000-788-1404                            (S) PHONE:

CONSUMER    Special Comment, Compliance Condition and/or remarks message disputed.
  STATES
COMMENTS
            SUBSCRIBER NAME      SUB.CODE     OPENED  RPT'D  BAL.OWING   PAST DUE   HIGH CRDT   PAYMENT      TP.ACCT  MOP
            ACCOUNT NUMBER       CREDIT LIMIT TERMS          LAST PYMT   DT 1ST DEL             HISTORY               ECOA
            TYPE LOAN            COLLATERAL                  SP.COMMENTS/STATUS/REMARKS CLOSED

VERIFIED    FIRST USA BANK       1B68010      11/95   12/02    $1572       $0        $5211      111111111111  R     01
  AS        4266869998378870       $17000     MIN31                                            111111111111         X
REPORTED:   CREDIT CARD                                DEC - DECEASED                          111111111111
                                                                                              111111111111

            ----------------------------------------------------------------------------------------------------

CHANGE                                        01/03    $338                $1573
DATA AS                             MIN10
SHOWN : X                                                                                                           I



RESPONSE CODES:   02 MODIFY ACCOUNT INFORMATION AS INDICATED


CONSUMER MESSAGE:  NOT DECEASED
AUTHORIZED PHONE/NAME:   614-776-7689   -   RUTH MAINA

            ----------------------------------------------------------------------------------------------------

                ACCT      PAYMENT     SPECIAL     COMPLIANCE      CONSUMER       MOP      REMARKS
                STATUS    RATING      COMMENT CD  CONDITION CD    INFORMATION IND CODE    CODE
        SENT    11                                                               01      DEC
        RECEIVED                                                                 01      DEC


                FIRST     MIDDLE      LAST      PREFIX
                NAME      NAME        NAME      SUFFIX        RESULT
VERIFICATION FLAGS  (S)   (D)         (S)                    (S)
```



Dep. Ex.
EXHIBIT NO. 6
6-24-04 JR

**TU0008**

```
LOC. 03                           TRANS UNION CORPORATION                    DATE: 01/08/03  TIME: 05:21
RPT-ID: KKVRB508-2                    CONSUMER RELATIONS                                      PAGE:   84
                              CRS ACDV/ACTV RESPONSES FOR MANUAL PROCESSING

03  DEPT: N
SU    BER RESPONSE DATE: 01/07/03              CONTROL: 15763185 002 02     MA/SM: 0924   SUB LOC: 001
TO COMPLY WITH F.C.R.A., A RESPONSE IS REQUIRED BY: 01/06/03   DATE:   12/31/02
```

```
                                       VERF    SUBSCRIBER CHANGES TO CONSUMER DEMOGRAPHIC DATA:
NAME: SCHMITT,PEGGY,MARIE         ,    (S) NAME:
  AKA:                                     AKA:
ADDR: 3107 NE ULYSSES ST               (S) ADDR:
      MINNEAPOLIS ,MN 55418
PREV: 3522 S 37TH AV                   (S) PREV:
      MINNEAPOLIS ,MN 55406
SSN/DOB/PHONE: 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 /  10/01/63 / 000-788-1404   (S) SSN/DOB/PHONE:          /          /
```

```
                                 CNTL# 15763185 002 02   DATE RECD: 12/26/02  PRI: 3

CONSUMER     SUBSCRIBER COMMENT/REMARKS MESSAGE DISPUTED
  STATES
COMMENTS     NOT DECEASED
```

| SUBSCRIBER NAME ACCOUNT NUMBER TYPE LOAN | SUB.CODE CREDIT LIMIT COLLATERAL/FLAG | OPENED TERMS | RPT'D | BAL.OWING LAST PYMT SP.COMMENTS/STATUS/REMARKS | PAST DUE MAX.DELQ.DATE | HIGH CRDT MD.AMT MD.MOP CLOSED | PAYMENT HISTORY MOS 30 60 90 | TP.ACCT | MOP ECOA |
|---|---|---|---|---|---|---|---|---|---|
| VERIFIED  NBGL-HERBERG | D 1RKG001 | 12/00 | 11/02A | $0 | $0 | $337 | | R | 9P |
| AS        9041410114845962 | $1500 | | | | | | | | X |
| REPORTED:  CHARGE ACCOUNT | | | | | | 10/02 | 0  0  0  0 | | |
| CHANGE | | | 01/03A | | | | | | |
| DATA AS | | | | | | | | | * |
| SHO  : X | | | | | | | 12 | | |

```
RESPONSE CODES:   999 FREE-FORM RESPONSE.


RESPONSE NARRATIVE: NO RECORD OF PEGGY  BEING DECEASED
CONSUMER MESSAGE:
AUTHORIZED PHONE/NAME:   601-592-2897  /   JUANITA DAY

REASON FOR PRINT : P - Response Code contains 999
```

Dep. EX.
EXHIBIT NO. 8
6-24-04  JR

TU0009

```
03                   YOUR TRANS UNION FILE NUMBER: 115763165
                     PAGE 1 OF 6
                     DATE THIS REPORT PRINTED: 01/11/2003

                     SOCIAL SECURITY NUMBER: ▓▓▓▓-9755
                     BIRTH DATE:            10/1963
                     YOU HAVE BEEN IN OUR FILES SINCE: 02/1988


                     PHONE: 788-1404
```

CONSUMER REPORT FOR:


    SCHMITT, PEGGY, MARIE
    3107 NE ULYSSES ST
    MINNEAPOLIS, MN 55418

FORMER ADDRESSES REPORTED:

    3522 S 37TH AV, MINNEAPOLIS, MN 55406
    4545 CINNAMON RIDGE, EAGAN, MN 55122

---

### INVESTIGATION RESULTS

---

WE HAVE COMPLETED OUR REINVESTIGATION AND THE RESULTS ARE SHOWN BELOW.


| ITEM | DESCRIPTION | RESULTS |
|------|-------------|---------|
| S...... CORPORATED | # :        5962 | NEW INFORMATION BELOW |
| FIRST USA BANK | #        /8870 | NEW INFORMATION BELOW |

ANY CORRECTIONS TO YOUR IDENTIFICATION REQUESTED BY YOU HAVE BEEN MADE AS NOTED
ABOVE. IF OUR INVESTIGATION HAS NOT RESOLVED YOUR DISPUTE, YOU MAY ADD A 100
WORD CONSUMER STATEMENT TO YOUR REPORT. YOUR UPDATED CREDIT INFORMATION
FOLLOWS:

---

### YOUR CREDIT INFORMATION

---

THE FOLLOWING ACCOUNTS CONTAIN INFORMATION WHICH SOME CREDITORS MAY CONSIDER TO
BE ADVERSE. ADVERSE ACCOUNT INFORMATION MAY GENERALLY BE REPORTED FOR 7 YEARS
FROM THE DATE OF THE FIRST DELINQUENCY, DEPENDING ON YOUR STATE OF RESIDENCE.
THE ADVERSE INFORMATION IN THESE ACCOUNTS HAS BEEN PRINTED IN >BRACKETS< FOR
YOUR CONVENIENCE, TO HELP YOU UNDERSTAND YOUR REPORT. THEY ARE NOT BRACKETED
THIS WAY FOR CREDITORS. (NOTE: THE ACCOUNT # MAY BE SCRAMBLED BY THE CREDITOR
FOR YOUR PROTECTION).

```
SAKS INCORPORATED       # 9041410114845962    REVOLVING ACCOUNT
                                              CHARGE ACCOUNT
    UPDATED  01/2003   BALANCE:        $0     INDIVIDUAL ACCOUNT
    OPENED   12/2000   MOST OWED:    $337     CREDIT LIMIT:    $1500
    PAID OFF 10/2002
    >STATUS AS OF 10/2002: PAYMENT AFTER CHARGE OFF/COLLECTION<
```

Dep. Ex.
EXHIBIT NO. 9
6-24-04  JR

REPORT ON SCHMITT, PEGGY, MARIE                          PAGE  2 OF  6
SOCIAL SECURITY NUMBER: ▓▓▓▓▓-9755        TRANS UNION FILE NUMBER: 115763185

---

OWING ACCOUNTS ARE REPORTED WITH NO ADVERSE INFORMATION

FIRST USA BANK          # 4266869998378870      REVOLVING ACCOUNT
DECEASED                                        CREDIT CARD
    UPDATED   01/2003   BALANCE:      $338      CONSUMER DECEASED
    OPENED    11/1995   MOST OWED:   $1573      PAY TERMS:  MINIMUM $10
                                                CREDIT LIMIT:    $17000
    STATUS AS OF 01/2003: PAID OR PAYING AS AGREED
    IN PRIOR 48 MONTHS FROM LAST UPDATE NEVER LATE

REDACTED

REPORT ON SCHMITT, PEGGY, MARIE                          PAGE  3 OP  6
SOCIAL SECURITY NUMBER:  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        TRANS UNION FILE NUMBER:  115763185



TU0012

REPORT ON SCHMITT, PEGGY, MARIE
SOCIAL SECURITY NUMBER: ████-██-9755       TRANS UNION FILE NUMBER: 115763185

REDACTED

RTGAGE PLUS PI VIA CBR/CBC MORTGAGE         INDIVIDUAL      01/09/2003
MISSIBLE PURPOSE - CREDIT TRANSACTION

REPORT ON SCHMITT, PEGGY, MARIE                                    PAGE 5 OF 6
SOCIAL SECURITY NUMBER: ~~XXXX~~-9755       TRANS UNION FILE NUMBER: 115763185



~~C~~...~~ ~~ STATEMENT:
    #HK# FRAUD VICTIM; DO NOT EXTEND CREDIT WITHOUT FIRST CONTACTING
    ME PERSONALLY AND VERIFYING ALL APPLICANT INFORMATION. CONTACT
    ME FOR VERIFICATION AT: HOME (612) 789-3903 OR WORK (612) 626-4030
    DATED: 02/97.
    THIS STATEMENT WILL EXPIRE IN 02/2004.

SPECIAL MESSAGES:

    INPUT CURRENT ADDRESS HAS BEEN USED (003) TIMES IN THE LAST (30) DAYS
    ON DIFFERENT INQUIRIES

    INPUT SSN HAS BEEN USED (003) TIMES IN THE LAST (30) DAYS ON DIFFERENT
    INQUIRIES

    SECURITY ALERT OR CONSUMER STATEMENT ON FILE RELATES TO TRUE NAME OR
    CREDIT FRAUD

REPORT ON SCHMITT, PEGGY, MARIE                                    PAGE  6 OF  6
SOCIAL SECURITY NUMBER: ████-9755        TRANS UNION FILE NUMBER: 115763185

IF     HAS BEEN A CHANGE IN YOUR CREDIT HISTORY RESULTING FROM OUR
INVESTIGATION, OR IF YOU ADD A CONSUMER STATEMENT, YOU MAY REQUEST TRANSUNION
TO SEND AN UPDATED REPORT TO THOSE WHO RECEIVED YOUR REPORT WITHIN THE LAST TWO
YEARS FOR EMPLOYMENT PURPOSES, OR WITHIN THE LAST ONE YEAR FOR ANY OTHER
PURPOSE. IF INTERESTED, YOU MAY ALSO REQUEST A DESCRIPTION OF HOW THE
INVESTIGATION WAS CONDUCTED ALONG WITH THE NAME, ADDRESS, AND TELEPHONE NUMBER
OF ANYONE CONTACTED FOR INFORMATION.

SHOULD YOU WISH TO CONTACT TRANSUNION, YOU MAY DO SO,

AT OUR WEB SITE:
WWW.TRANSUNION.COM/INVESTIGATE

BY MAIL:
TRANSUNION CONSUMER RELATIONS
P.O. BOX 2000
CHESTER, PA 19022-2000

BY PHONE:
1-800-916-8800
OUR BUSINESS HOURS IN YOUR TIME ZONE ARE:
8:30 A.M. TO 4:30 P.M., MONDAY-FRIDAY, EXCEPT MAJOR HOLIDAYS.
PLEASE HAVE YOUR TRANSUNION FILE NUMBER LOCATED AT THE TOP OF THIS PAGE
AVAILABLE.

**TU0015**

```
LOC. 03                           TRANS UNION CORPORATION                    DATE: 03/21/03  TIME: 05:53
RPT-ID: KKAVB500-1                  CONSUMER RELATIONS                                        PAGE: 9941
                              ACDV3 RESPONSES THAT WERE AUTO UPDATED
```

```
0.        PT: N
SUBSCRIBER RESPONSE DATE: 03/20/03                  CONTROL: 115763185 005 01   A   MA/SM: 0103  SUB LOC: 001
TO COMPLY WITH F.C.R.A., A RESPONSE IS REQUIRED BY: 03/21/03   DATE ENTERED: 03/14/03   DATE RECD: 03/12/03
```

```
                                              VERF   SUBSCRIBER CHANGES TO CONSUMER DEMOGRAPHIC DATA:
NAME: SCHMITT, PEGGY MARIE                     (S) NAME:
  AKA:                                              AKA:
ADDR: 3107 NE ULYSSES ST                       (S) ADDR:
      MINNEAPOLIS, MN 55418
PREV: 3522 S 37TH AV                           (U) PREV:
      MINNEAPOLIS, MN 55406

SSN:      -9755                                (S) SSN:
DOB: 10/01/63                                  (U) DOB:
PHONE: 000-788-1404                            (U) PHONE:
```

```
CONSUMER   Belongs to another individual with same/similar name. Provide complete ID (incld SSN, DOB, Generation code, etc).
  STATES
COMMENTS
```

| | SUBSCRIBER NAME | SUB.CODE | OPENED | RPT'D | BAL.OWING | PAST DUE | HIGH CRDT | PAYMENT | TP.ACCT | MOP |
|---|---|---|---|---|---|---|---|---|---|---|
| | ACCOUNT NUMBER | CREDIT LIMIT | TERMS | | LAST PYMT | DT 1ST DEL | | HISTORY | | ECOA |
| | TYPE LOAN | COLLATERAL | | | SP.COMMENTS/STATUS/REMARKS | | CLOSED | | | |
| VERIFIED | FIRST USA BANK | 1B68010 | 11/95 | 03/03 | $194 | $0 | $5211 | 111111111111 | R | 01 |
| AS | '8870 | $22000 | MIN10 | | | | | 111111111111 | | X |
| PTED: X | CREDIT CARD | | | | DEC - DECEASED | | | 111111111111 | | |
| | | | | | | | | 111111111111 | | |

```
- - - -
```

```
CHANGE                                    03/03
DATA AS
SHOWN :                                                                                            I
```

```
RESPONSE CODES:    01 ACCOUNT INFORMATION ACCURATE AS OF DATE REPORTED
```

```
CONSUMER MESSAGE:
AUTHORIZED PHONE/NAME:    302-985-7143   -   DEBBIE JONES
```

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
```

| | ACCT STATUS | PAYMENT RATING | SPECIAL COMMENT CD | COMPLIANCE CONDITION CD | CONSUMER INFORMATION IND | MOP CODE | REMARKS CODE |
|---|---|---|---|---|---|---|---|
| SENT | 11 | | | | | 01 | DEC |
| RECEIVED | | | | | | 01 | DEC |

| | FIRST NAME (S) | MIDDLE NAME (S) | LAST NAME (S) | PREFIX SUFFIX | RESULT (S) |
|---|---|---|---|---|---|
| VERIFICATION FLAGS | | | | | |



**TU0026**